**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 4 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KENNETH F. NUCKOLS,

      Petitioner-Appellant,

v.

GARY L. GIBSON,

      Respondent-Appellee.

No. 99-6325

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-86-2602-W)**

---

Gary S. Peterson, Pray, Walker, Jackman, Williamson & Marlar, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Kellye G. Bates, Assistant Attorney General (W. A. Drew Edmondson, Attorney General of Oklahoma with her on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **TACHA**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **KANE**, Senior District Judge.[*]

---

**PORFILIO**, Senior Circuit Judge.

---

    [*]The Honorable John L. Kane, Jr., Senior District Judge for the United States District Court of Colorado, sitting by designation.

In this appeal, Kenneth F. Nuckols (Petitioner) contends the United States District Court for the Western District of Oklahoma erred in denying a writ of habeas corpus that would have effectively vacated his state conviction for first degree murder. After considering the issues, we conclude the state prosecutor's failure to turn over material information in his possession regarding alleged criminal activities of the state's principal witness undermines judicial confidence in the verdict. The denial of that evidence significantly hampered Petitioner's ability to cross-examine the witness. We therefore conclude Petitioner was deprived of a fair trial and reverse the decision of the district court denying Petitioner relief under 28 U.S.C. § 2254.

LITIGATION HISTORY

In two separate Oklahoma state court cases, Petitioner was convicted of murdering Roy Maxwell and Freddie Howell. Mr. Nuckols entered a plea of guilty to the Maxwell homicide and received a sentence of life imprisonment. He is currently serving that sentence. After trial and conviction for the Howell murder, Mr. Nuckols was sentenced to death. It is that sentence which is before us in this appeal, but tangential issues relating to the Maxwell homicide are also raised here.

This case has a lengthy litigation history which includes direct appeals to the Oklahoma Court of Criminal Appeals (OCCA) arising from his original trial as well as post-conviction collateral proceedings in state court. We need not elaborate on those

matters, but reference to the immediate history of the case aids an understanding of our resolution of this appeal.

Earlier in the present case, the district court granted Mr. Nuckols' motion for partial summary judgment and set aside his death sentence. *Nuckols v. Reynolds*, 970 F. Supp. 885 (W.D. Okla. 1993). The court then issued an order asking the parties to show cause why further relief should not be granted, proposing Mr. Nuckols be released from his conviction or resentenced "to a sentence no more severe than life imprisonment with possibility of parole." Respondent Ward (State) challenged that order, and the court stayed it. Although the State sought to appeal the decision, we dismissed the case because we lacked jurisdiction to consider a nonfinal order under 28 U.S.C. § 2253. *Nuckols v. Reynolds*, 70 F.3d 123 (10th Cir. 1995) (unpublished).

After remand, the district court addressed the remaining claims. Although denying relief, it issued a certificate of probable cause authorizing the appeal in this pre-AEDPA[1] case. On appeal, Petitioner raises several issues, but we focus on only one. We determine Mr. Nuckols' right to a fair trial was denied because of the prosecution's violation of *Brady v. Maryland*, 373 U.S. 83 (1963), which ultimately inhibited full cross-examination of the veracity of the key prosecution witness. This conclusion

---

[1]Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996).

obviates discussion of the remaining issues Petitioner raised concerning his rights as defined in *Miranda v. Arizona*, 384 U.S. 436 (1966).

CRITICAL FACTS AND CIRCUMSTANCES

In the summer of 1982, while investigating the murders of Freddie Howell in Pottawatomie County, Oklahoma, and Roy Maxwell in Lincoln County, Oklahoma, Pottawatomie County Sheriff Ruie Birks got a tip from an informant that Greg Campbell and Kenneth Nuckols, his friend, were involved in the two homicides. Deputies arrested Campbell late Friday afternoon, August 20, 1982, and jailed him at the Pottawatomie County Courthouse in Shawnee, Oklahoma. Later that evening around 11:00 p.m., Sheriff Birks and a deputy found Mr. Nuckols, then twenty-one, at a party; arrested him; and, en route to the jail, read Mr. Nuckols a *Miranda* warning. According to Sheriff Birks, Mr. Nuckols was intoxicated at that time.

Once at the jail, seven officers and Jerry Campbell, Greg's brother and Petitioner's friend, divided into teams and traded off interrogating both suspects from midnight until 5:00 a.m. After two hours of interrogation, officers were able to obtain a statement from Campbell implicating himself and Mr. Nuckols in both homicides.

The second team of interrogators then confronted Mr. Nuckols, again reading him a *Miranda* warning, and questioned him for a short time about the Roy Maxwell homicide. After they left the room, Jerry Campbell was sent back in alone for further

- 4 -

conversation during which he urged Mr. Nuckols to "talk to them and tell them – tell them about it, cooperate with them." Doing so, he said, "could be easier."

Mr. Nuckols agreed, and at 3:00 a.m., investigators returned, read another *Miranda* warning, and acquired Mr. Nuckols' statement implicating himself in the Maxwell murder. Officers then obtained a tape recorder and had Mr. Nuckols repeat the confession. That process concluded at 4:30 a.m. A few minutes later, with the tape running, officers repeated a *Miranda* warning and asked Mr. Nuckols about the Freddie Howell murder. Mr. Nuckols responded, "Mind if I just talk to my lawyer on this one?" Agent Brady answered, "No[.] It's your decision . . . ." Mr. Nuckols told the officers, "Yeh, for the time being. Yes," indicating he did not want to continue the conversation further. Although he did not specifically ask his interrogators to get him an attorney, the officers, in turn, did not explain his right to an appointed attorney.[2]

An hour later, at daybreak on Saturday, Deputy Sheriff Billy Ware, an admitted acquaintance of Mr. Nuckols and his family, escorted him to an unairconditioned holding cell used for drunks. As the day progressed and the one-man cell filled with four other prisoners, Deputy Ware made several visits to Mr. Nuckols to engage in "small talk."[3] At 9:00 that evening, a significant visit took place, but what actually occurred is disputed in the subsequent testimony of Petitioner and Ware.

---

[2]The district court noted counsel was not appointed until the following Wednesday, August 25, 1982.

[3]Ware's description.

However, full resolution of that dispute was critical to the trial because ultimately it was determinative of the admissibility of Mr. Nuckols' confessions to the Howell homicide. More importantly, as noted by the district court, those confessions "were the only evidence offered at trial to link Nuckols with the crime charged in this case." Moreover, the OCCA itself emphasized the importance of resolving the dispute, observing the issue turned upon the credibility of either Ware or Mr. Nuckols. That was a difficult choice in the opinion of the court. ***Nuckols v. State*** 690 P.2d 463, 467 (Okla. Crim. App. 1984).

The dispute was disclosed in two separate pretrial hearings. Both Ware and Petitioner testified about Ware's activities on that eventful Saturday. Mr. Nuckols described how Ware made periodic visits to his cell, telling Petitioner he just did not understand how Mr. Nuckols could be involved in "this kind of trouble."

A. Yeah. And then, you know, like he said, you know, "Why don't you just go ahead and . . . give a statement to the Sheriff on this other case?"

Q. Did he ever try to interrogate you and ask you times and dates . . . concerning the case?

A. No.

Q. How long a period of time would he stay back there and talk with you about it?

A. About 10, 15 minutes, you know, at a time.

Q. And during this time, you repeatedly told him you didn't care to talk.

A. Yeah.

Mr. Nuckols further testified Ware continued to press him about whether he should get the Sheriff so Petitioner could give another statement. When asked why he eventually capitulated, Mr. Nuckols stated:

> [W]hen I'm in the drunk tank, a small tank like that, well, I just pace back and forth, no cigarettes, nothing to read or something like that. It completely just drives me nuts being in a small tank like that or cell. . . .
>
> Plus – Well, since I'd already went ahead and gave this first statement, you know, and I thought, well they'll put me upstairs if I go ahead and give this other one. I'd already gave this other statement, so, you know, why not just go ahead and go through it all?

Ware described the nature of the visits and the "small talk."

> Just talking about where he had been, what he was, you know, he had been out in California. It all started, he wanted to borrow, you know, some cigarettes, and I took him cigarettes and just stood there and talked to him and I think I got him a cup of coffee or something like that, you know.[4]

By 9:00 that night, Mr. Nuckols told Ware he wanted to talk to Investigator Mayo. When Ware could not find Mayo, Mr. Nuckols said he would talk to Sheriff Birks. Ware testified:

> Q. And what did he tell was the purpose in wanting to talk to the Sheriff?
>
> A. Well, he just wanted to tell him about what went on.
>
> Q. All right. Now, was that his idea or yours?

---

[4]During the trial, Ware testified in essentially the same manner. He stated he mainly had small talk with Mr. Nuckols, gave him cigarettes, and told him he couldn't believe he was in jail.

- 7 -

A. It was his idea.[5]

Sheriff Birks arrived at the jail, repeated the *Miranda* warning, and asked Mr.

Nuckols if he understood his rights and still wanted to talk. When Mr. Nuckols said yes,

Sheriff Birks began the interrogation, and "between 10:45 and 11:25 p.m., Saturday,

August 21, 1982," Mr. Nuckols confessed. His statement was taped with Sheriff Birks

and Ware present. When he finished, Ware escorted Mr. Nuckols to a regular jail cell.

The next day, Investigator Mayo met with Mr. Nuckols in a room at the District

Attorney's office. During the ensuing interrogation, a video camera recorded Mr.

Nuckols' second confession.

Before trial, defense counsel, Marshall Basham, filed a motion for the

prosecution's disclosure of all *Brady* evidence and for suppression of Mr. Nuckols'

confessions under the Fifth and Fourteenth Amendments. The pretrial hearing on the

motion to suppress pitted Mr. Nuckols' testimony that Deputy Ware induced him to

confess against Ware's testimony that Mr. Nuckols voluntarily asked to speak to the

---

[5]At trial, during the guilt phase, Mr. Nuckols' aunt, Dorothy Keel, testified she spoke to Ware in September 1982, and he told her:

> that he had talked to [Mr. Nuckols] . . . during the night . . . , off an[d] on, through that first night when they had arrested him. And that he had told . . . [Mr. Nuckols] that he might as well go ahead and talk to the Sheriff and - because, he said, "They have got evidence on you, they know you did it, you might as well go ahead and talk to him about it." And he said he had come back several times during the night and talked to . . . [Petitioner] about it.

Sheriff. Because Ware's version of the events made it appear Petitioner voluntarily decided to waive his *Miranda* rights, Mr. Basham had to establish Ware's lack of credibility.

To do so, counsel asked to question Ware about allegations of theft at the jail on the basis of innuendo which counsel had heard. The trial court overruled the request, holding, in effect, the attempt was an improper method of impeachment. The court ultimately denied suppression of Petitioner's statements.

Mr. Basham also demanded production of all evidence "that tends to exculpate [Petitioner] or cast a reasonable doubt upon [his] guilt." The demand produced nothing. The uncontroverted evidence now discloses material facts obviously known by the District Attorney at that time.

Before trial, Paul Abel replaced Ruie Birks as Pottawatomie County Sheriff. Because Abel was concerned about allegations of theft at the jail which had been left unresolved by Sheriff Birks, Sheriff Abel launched his own investigation. Abel quickly focused on Ware who, during the relevant time, had access to money and property that later were missing. When Ware bought an expensive gun soon after a large theft, Sheriff Abel, with the agreement of the District Attorney, asked Ware to take a polygraph test. That test purportedly showed "involvement, guilty knowledge, and suspicion." Although

Ware remained on the job for some time, Sheriff Abel fired him in December 1982 before the trial, stating the reason was "sleeping on the job."[6]

Defense counsel Basham apparently had discovered some of this evidence and contended it revealed a motive for Ware to attempt to ingratiate himself with the Sheriff and deflect dissatisfaction with his conduct. To Basham, these facts were essential to undermine Ware's credibility.

Petitioner further alleged the District Attorney also failed to disclose evidence that Ware was tangentially involved in the Roy Maxwell homicide. That is, in October 1982, state officers questioned Ware about selling guns provided by Lagretta Maxwell, Roy's wife. Testimony in the Maxwell trial revealed that Lagretta had asked her son-in-law, Bo Arnold, to hire somebody to kill her husband. Arnold hired Petitioner and his co-defendant, Campbell. To help pay for that service, Lagretta stole two of Roy's guns and asked Ware to sell them.

When officers initially questioned Ware about his connection to the gun transactions, he told them he simply arranged the sale between Arnold and the purchaser and received $10 for his services. In November 1982, however, Ware told Sheriff Abel

---

[6]Soon after the conclusion of the trial, Sheriff Abel filed a claim on the county's fidelity bond for the money and property losses sustained by his office. In an accompanying letter to the insurer, Sheriff Abel stated the employee whom he considered the probable thief had been fired on other grounds. The sheriff wrote, "[T]here was plenty of probable cause that this particular employee was directly and totally responsible for the above thefts. Since his termination there has [sic] been absolutely no funds missing. However, the person's guilt could not be proven in a court of law."

- 10 -

about the guns. The Sheriff responded, "You are not fooling with something here that is a minor thing," and told him to write a statement.

Mr. Basham contended, in the state court post-conviction proceeding, the written statement detailed Ware's buying, not selling, the two guns, and receipt of $135 not as a finder's fee but in the resale of the guns. When the statement was made, with Petitioner's trial pending and Ware as the principal witness, Sheriff Abel told District Attorney Roberson he would fire Ware and bring charges against him if his role was not innocent. Roberson told Abel neither firing nor prosecution was necessary.[7] On the basis of these facts and circumstances, we proceed to consideration of the merits of this appeal.

THE ***BRADY*** ISSUE

Petitioner's ***Brady*** argument fixes upon two particulars. First, he contends the prosecution failed to disclose Ware's implication in the thefts from the Sheriff's office. Second, he asserts the district attorney should have disclosed Ware's statement regarding his participation in the sale of guns to fund the Maxwell murder. He argues the district court failed to correctly perceive the nature of the legal issue he raised, and, therefore, ruled incorrectly. Resolution of this issue requires that we review *de novo* the district court's legal conclusions and apply clear error to its factual findings while presuming the

---

[7]Petitioner contends Ware's involvement with the gun sales is material because of the conduct of Petitioner's interrogation for the Howell and Maxwell murders. Mr. Nuckols notes Ware interposed questions to him about a meeting at a friend's house. The friend was Bo Arnold. Mr. Nuckols' counsel asserts when the interrogation is read in its entirety, it becomes evident that Ware was attempting to clear himself.

state court's fact-finding is correct. ***Richmond v. Embry***, 122 F.3d 866, 870 (10th Cir. 1997).

The district court ruled withholding the Ware evidence did not meet the test of materiality in reliance upon ***Kyles v.Whitley***, 514 U.S. 419, 434 (1995) (the test of materiality is whether the petitioner's trial resulted in a "verdict worthy of confidence" despite the non-disclosure of the contested evidence); thus, its confidence in the outcome of the trial was not undermined. ***United States v. Bagley***, 473 U.S. 667, 678 (1985). In reaching these conclusions, the district court only looked at Ware's statements regarding the guns involved in the Maxwell case. These statements represent one-half of the equation, however. Full analysis requires consideration of both transactions together.

In our view, the issue focuses upon whether the withheld statements were material, and we believe they are. Ware's trial testimony was key to a successful prosecution. The sole evidence linking Mr. Nuckols to the death of Freddie Howell was Petitioner's confession. Thus, it was critical for the State to establish the admissibility of that confession, but its admissibility hinged upon proof that Mr. Nuckols initiated the interview which produced the incriminating statements. Were it otherwise, the confession would have to have been suppressed. The only witnesses on this critical point were Ware and Petitioner, each of whom negated the other's testimony. If Ware's testimony that Mr. Nuckols initiated the interrogation were impeached, the entire support for the State's case would have been significantly undermined, if not destroyed

altogether. So critical was the question of credibility, even the OCCA recognized, "[w]ere we to agree with [Mr. Nuckols'] version, we would hold that the interrogation was initiated by Jailer Ware." ***Nuckols v. State***, 690 P.2d at 467.

In this context, then, we cannot agree with the district court's analysis. Although the State attempts to provide a way to support the district court's view by argumentatively propounding hypothetical questions regarding Ware's possible motives for not telling the truth, those questions should have been resolved by a jury. That did not happen, of course. The prosecution withheld evidence that would have allowed defense counsel the means to test Ware's credibility in the crucible of cross-examination. Indeed, in ***Bagley***, 473 U.S. at 677, (quoting ***Giglio v. United States***, 405 U.S. 150, 154 (1972)), the Court reiterated, "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e] general rule [of ***Brady***]." Because of the value of cross-examination, when the credibility of a prosecution witness is important, impeaching evidence is subject to ***Brady*** disclosure. ***Id.*** at 676.

Indeed, as the Court noted in ***Strickler v. Greene***, 527 U.S. 263, 281 (1999).

> [T]he term "***Brady*** violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence – that is, to any suppression of so-called "***Brady***" material" – although, strictly speaking, there is never a real "***Brady*** violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true ***Brady*** violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

- 13 -

evidence must have been suppressed by the State, either willfully or inadvertently; and the prejudice must have ensued.

There is no question here that the State willfully or inadvertently failed to disclose Ware's involvement in the thefts and the Maxwell case. Those facts are impeaching. They would have provided the defense with the opportunity to call into question whether Ware had a motive for his testimony regarding the initiation of the interrogation resulting in Petitioner's confession. They could also have been used to question whether Ware had a motive to goad Mr. Nuckols into waiving his right to counsel during the interrogation and confessing to the crime. For the purpose of discussion here only, we do nothing more than suggest there is a reasonable probability that Ware had ulterior motives. A reasonable probability is a probability sufficient to undermine confidence in the outcome. ***Ballinger v. Kerby***, 3 F.3d 1371, 1376 (10th Cir. 1993), quoting ***Bagley***, 473 U.S. at 682 (opinion of Blackmun, J.). The evidence here meets that test.

Because impeachment of the witness who held the key to successful prosecution was denied to the defense, we have no doubt Petitioner suffered prejudice as a consequence. Moreover, we are not confident of the outcome of the trial. We believe the district court should have reached this conclusion and granted a writ of habeas corpus on this issue alone.[8] "As in many death penalty, habeas corpus cases, the problem presented

---

[8]***Compare Tankleff v. Senkowski***, 135 F.3d 235, 250 (2d Cir. 1998), where denial of habeas on this ground was affirmed when defense counsel had extensively and thoroughly cross-examined the witness and raised questions about his reliability. "When a witness's credibility has already been substantially called into question in the same

(continued...)

- 14 -

here is not whether the prisoner is innocent of a homicide - the killing is conceded - but rather whether he received the full benefit of fair rules of constitutional procedure and a fair opportunity . . ." to a jury trial. ***Kordenbrock v. Scroggy***, 919 F.2d 1091, 1093-94 (6th Cir. 1990)

Having reached the conclusion the district court erred in its ***Brady*** holding, we see no reason to discuss any of the other issues raised. Upon remand the district court should enter an order granting habeas corpus, but giving the State a time the district court finds reasonable to retry the Petitioner on the question of guilt. In the meantime, Mr. Nuckols remains in custody because of his life sentence in the Maxwell case.

**REVERSED AND REMANDED WITH INSTRUCTIONS**.

---

[8](...continued)
respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a ***Brady*** claim." ***Id.*** at 251.