GORSUCH, Circuit Judge,
dissenting.
Stan Ford, a Denver firefighter, had no criminal record and no known involvement with illegal firearms until an undercover government agent, Keith Heavilin, approached Mr. Ford and repeatedly solicited his assistance in procuring illegal weapons. Eventually, Mr. Ford obtained three such weapons and sold them to Mr. Heavilin. At trial, the jury acquitted Mr. Ford in connection with the first two sales, finding that he was entrapped by the government’s agent. In connection with the third sale, the jury convicted Mr. Ford. But the jury convicted on this count only *992 after the government argued that, whatever else the evidence at trial suggested, it definitively established that the idea for the third gun sale originated with Mr. Ford, not the government’s agent.
We now know the government’s critical representation to the jury at trial about the initiation of the third gun sale was in error. The suppressed pre-October 5[1] email definitively shows that Mr. Heavilin conceived and heavily promoted the idea of a third transaction, just as he had the two previous gun sales for which Mr. Ford was acquitted. For this reason, and while I agree with much else in the court’s thoughtful analysis, I cannot help but conclude that the suppressed pre-October 5 email was material to Mr. Ford’s entrapment defense. Accordingly, I would reverse and remand this matter for a new trial on count 3.
I
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), recognized that, for a trial to be worthy of our judicial system, the accused must have access to all material exculpatory evidence in the government’s possession. “A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him ... casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice.” Id. at 87-88, 83 S.Ct. 1194. Such a prosecution is also inconsistent with the role of the government lawyer in our legal system. To be sure, the prosecutor “is not a neutral, he is an advocate; but an advocate for a client whose business is not merely to prevail in the instant case. [The government’s] chief business is not to achieve victory but to establish justice .... [and] the Government wins its point when justice is done in its courts.” Id. at 88 n. 2, 83 S.Ct. 1194 (quoting an address of former Judge and Solicitor General Simon E. Sobeloff).
To establish a violation of the due process imperative embodied in Brady, a criminal defendant need not prove any malicious intent on the part of the prosecution in suppressing evidence. Id. at 87, 83 S.Ct. 1194. Rather, a defendant must demonstrate simply that “(1) the prosecution suppressed evidence, (2) the evidence was favorable to defendant, and (3) the evidence was material.” United States v. Quintanilla, 193 F.3d 1139, 1149 (10th Cir.1999). The court today concludes that Mr. Ford has satisfied the first two essential elements of a Brady claim, and I agree. Maj. Op. at 982-84. There is no dispute that the government failed to produce the pre-October 5 email at trial, and neither is there any question that the email was favorable to Mr. Ford, showing as it does that Mr. Heavilin, not Mr. Ford, initiated discussions about a third gun sale. As the district court found, the pre-October 5 email “corroborate^] [Mr. Ford’s] claim that the idea and impetus for the third illegal machine gun was broached and pursued by [Mr.] Heavilin, not the defendant, and ... [goes] to credibility because to some extent [it] contradicted [Mr.] Heavi-lin’s and Agent Schmitt’s testimony that the idea and opportunity for the third machine gun came from defendant ‘out of the blue.’ ” Dist. Ct. Op. at 11.
The only real question before us is whether the suppressed pre-October 5 email was material to Mr. Ford’s defense. We review this question de novo. United States v. Smith, 534 F.3d 1211, 1221-22 (10th Cir.2008); United States v. Redcorn, 528 F.3d 727, 744 (10th Cir.2008). And in *993 doing so, we ask whether there is “a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” United States v. Bagley, 473 U.S. 667, 681— 82, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In turn, a “reasonable probability” is understood to mean a “probability sufficient to undermine confidence in the outcome.” Id. at 682, 105 S.Ct. 3375. This inquiry “does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Instead, the touchstone is simply whether the ultimate verdict is one “worthy of confidence.” Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
Though reluctant to part ways with my colleagues, I am convinced the pre-October 5 email was material based on the confluence of the following factors:
First, the suppressed exculpatory evidence is dispositive of what we have repeatedly recognized to be the “central question” in entrapment cases. In order to convict Mr. Ford for his role in the third gun sale, the government had to prove beyond a reasonable doubt that Mr. Ford was not entrapped. See Jury Instruction No. 17. As we have recognized is true in most cases raising the entrapment defense, the “central question” before the jury in this trial was whether the government or the defendant initiated the illegal activity. See United States v. Dozal-Bencomo, 952 F.2d 1246, 1250 (10th Cir.1991). The suppressed pre-October 5 email definitively answers this central question, proving that it was the government’s informant, not Mr. Ford, who instigated the third gun sale. As the district court explained, the suppressed email, in which Mr. Heavilin “exhort[ed] [Mr. Ford] to locate and sell” the third gun, “corroborated [Mr. Ford’s] claim that the idea and impetus for the third illegal machine gun was broached and pursued by [Mr.] Heavi-lin.” Dist. Ct. Op. at 11.
Second, in the absence of the pre-Octo-ber 5 email, the government at trial was able to paint a gravely inaccurate picture on the central question before the jury. The government submitted evidence to the jury suggesting that the idea for a third weapon sale originated with Mr. Ford, specifically an October 5 email from Mr. Ford in which he plainly appears to be promoting a third gun sale to Mr. Heavilin, indicating that there are “[n]ot any good [gun] deals out there right now.... Just keep watching....” See Dist. Ct. Op. at 13. The government also repeatedly argued that the evidence proved Mr. Ford instigated the discussions about a third gun sale; as early as its opening statement the government told the jury that, after the sale of the second gun on August 2, “[i]t is the defendant who at that point comes back to Mr. Heavilin, and leads us up to the date of October 18th of 2005.” R. Vol. VIII at 170 (emphasis added); see also R. Vol. IX at 171; R. Vol. X at 4 (other instances of government pursuing this theory throughout trial). The district court expressly found that, “[a]s to count three, ... the government contended that there was no entrapment by Heavilin because the idea and impetus for the third illegal weapon came from defendant.” Dist. Ct. at 3; see also id. at 11 (stating that the pre-October 5 email “contradicted Heavi-lin’s and Agent Schmitt’s testimony that the idea and opportunity for the third machine gun came from defendant ‘out of the blue.’ ”). With the benefit of the pre-Octo-ber 5 email, we now know that the government’s evidence and argument at trial on the central question before the jury was in error.
*994 Third, the absence of the pre-October 5 email appears to answer why ■ the jury convicted Mr. Ford on count 3 even after acquitting him on counts 1 and 2. To carry its burden of showing Mr. Ford was not entrapped, the government had to establish one of three things — (1) the idea for the third gun transaction did not originate with government agents; (2) the government agents did not persuade or talk Mr. Ford into committing the crime; or (3) Mr. Ford was predisposed to commit the crime. See Jury Instruction No. 22. With the exception of the pre-October 5 email, the nature and quality of the evidence the government relied on to carry its burden under these elements was materially identical across all three counts. It was only on count 3, and only by virtue of its suppression of the pre-October 5 email, that the government could plausibly suggest that Mr. Ford initiated the idea for a gun sale. On the record before us, then, it strongly appears that, but for the suppression of the pre-October 5 email, the jury would have acquitted Mr. Ford on count 3 as well.
Fourth, not only did the government seek a conviction on the basis of an eviden-tiary omission for which it was responsible, it expressly asked the jury to draw an adverse inference about the defendant’s credibility — and thus the reliability of his entire testimony — based on its own Brady failure. At trial, Mr. Ford took the stand and offered extensive testimony in his defense. In the course of his testimony, as the government concedes, Mr. Ford averred that it was Mr. Heavilin, not he, who initiated discussions over a third gun sale. See Appellee Br. at 17 (“Defendant was ... positioned to argue, as he did repeatedly and forcefully at trial, that the idea and impetus for a third machine gun was [Mr.] Heavilin’s.”) (emphasis added). Mr. Ford even went so far as to testify that the government had failed to produce emails from Mr. Heavilin that could confirm his account. R. Vol. XIII at 101-102. The government responded in its closing rebuttal argument by suggesting that Mr. Ford’s credibility should be discounted by the jury because — in contradiction to Mr. Ford’s testimony — “the defense has access to the same information that the government does.” R. Vol. XV at 194. We now know the government wrongly attacked Mr. Ford’s credibility and did so based on an evidentiary omission for which it bears responsibility.
Finally, we must be mindful that “[w]hat might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict.” United States v. Robinson, 39 F.3d 1115, 1119 (10th Cir.1994); see also United States v. Agurs, 427 U.S. 97, 113, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (stating with respect to Brady violations that “if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt”). To be sure, this is not a case where the withheld evidence is insignificant or minor. But neither can there be any question just how close this case was. The jury apparently accepted Mr. Ford’s entrapment defense on the first two counts of possessing or transferring an automatic weapon, acquitting him of both charges. The jury found Mr. Ford guilty solely on count 3, and it reached its decision only after one and a half days of deliberation, during which time it sent a note to the court that stated jurors were divided over the question of entrapment, R. Vol. XVI at 11, and asked to be provided with transcripts of certain witnesses’ testimonies, R. Vol. XVII at 6. And it appears that the jury’s ultimate conviction on count 3 may well have been secured only as a result of the government’s failure to produce the pre-October 5 email. *995 These circumstances testify to how narrow a thread the jury’s conviction on count 3 depended, how hard the jury struggled with this case, and thus how cautious we must be in suggesting that the suppressed email was immaterial.
Given the confluence of all the foregoing circumstances, I cannot help but conclude that the jury’s guilty verdict on count 3 is not worthy of the confidence of our legal system. This is not to say that Mr. Ford is surely innocent. But it is to say that he surely deserves a new trial, one in which he has access to, and the right to make use of, the exculpatory evidence the government possesses. The central promise of our criminal justice system is a trial based on all available and competent evidence, not one based on the government’s best evidence. The conviction before us, hanging on the barest of threads and dependent on the omission of exculpatory evidence, is “inconsistent with the rudimentary demands of justice.” Brady, 373 U.S. at 87, 83 S.Ct. 1194 (internal quotation marks omitted).
Neither does it matter that the government’s failure to fulfill its Brady obligations in this case was apparently the result of oversight rather than deliberate mischief. The principle animating Brady and the promise of our legal system is the “avoidance of an unfair trial to the accused.” Id. at 87, 83 S.Ct. 1194. It is foundational to our legal tradition that “[sjociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: ‘The United States wins its point whenever justice is done its citizens in the courts.’ ” Id. at 87-88, 83 S.Ct. 1194. Regrettably, I cannot say that promise was fulfilled in this case.
Underscoring my conviction on this score, the government has cited to us no case affirming a conviction in the face of so many factors converging to call its reliability into question. Neither have my colleagues cited any. Meanwhile, our circuit and others have reversed for new trials in highly similar (and even sometimes arguably less troubling) circumstances — including where, as here, the suppressed evidence “b[ore] importantly on the central issue at trial”; the prosecutor attacked the defendant’s credibility for testifying about facts the government improperly withheld; and the jury “evidently struggled]” with the case. United States v. Gil, 297 F.3d 93, 103-04 (2d Cir.2002); see also Kyles, 514 U.S. at 453-54, 115 S.Ct. 1555 (finding materiality and reversing for new trial where suppressed evidence could have gone, in part, to undermining the credibility of key witnesses for the prosecution); Scott v. Mullin, 303 F.3d 1222, 1232 (10th Cir.2002) (finding materiality and reversing for new trial where government withheld evidence that could have assisted the defense in undermining witnesses for the prosecution); Nuckols v. Gibson, 233 F.3d 1261, 1266-67 (10th Cir.2000) (same); United States v. Minsky, 963 F.2d 870, 875 (6th Cir.1992) (same). I see no basis for reaching a contrary result here.
II
The government and my colleagues suggest we need not be worried about the fairness of this trial. Though the government suppressed the pre-October 5 email, and though it was evidence favorable to Mr. Ford, the government and my colleagues suggest that the email should be deemed “immaterial.” After careful consideration of each of the arguments they *996 advance for this conclusion, I am unable to agree.
A
The government argues that the pre-October 5 email, in its tendency to show Mr. Heavilin as the initiator of the third gun sale, was merely “cumulative” of existing evidence. But this argument depends on a misconception of the term. To qualify as cumulative, the evidence in question must be “[additional evidence that supports a fact established by existing evidence.” Black’s Law Dictionary 596 (8th ed.) (emphasis added). The term “suggests a needless redundancy, especially where the additional evidence will result in ‘undue delay’ or ‘waste of time.’ Redundancy, however, means that the additional information provides no additional relevant data points to the jury, that they are forced to listen to evidence that tells them nothing at all new.” United States v. Ramirez-Lopez, 315 F.3d 1143, 1173 (9th Cir.2003) (Kozinski, J., dissenting) (citations omitted) (emphasis added), majority opinion withdrawn, 327 F.3d 829 (2003).
The pre-October 5 email cannot remotely be characterized as a needless redundancy. To be sure, the government stresses that the jury could have inferred the existence of the pre-October 5 email from the email Mr. Ford sent Mr. Heavilin on October 5. Appellee’s Br. at 16-17. And maybe this is so. The problem remains, however, that, even if the jury could have reasonably inferred the existence of a pre-October 5 email, the content of that email was impossible to surmise. From the October 5 email, one arguably might be able to infer that the parties had an earlier communication. But there is simply no way to divine that the parties’ earlier communication was exculpatory in nature, showing that Mr. Heavilin initiated the idea for a third gun sale.
Notably, the government ultimately concedes as much, admitting that “the content of [Mr.] Heavilin’s omitted message is unknown,” and, indeed, that the jury could well have thought that the pre-October 5 email contained only “a suggestion by [Mr.] Heavilin that the two men meet socially,” given “[Mr.] Heavilin’s penchant for beginning his communications with Defendant without specifically mentioning his desire for a machine gun.” Id. at 5-6. In these circumstances, the pre-October 5 email can hardly be fairly characterized as a waste of time. It alone demonstrated that Mr. Heavilin, not Mr. Ford, initiated the third gun sale. Far from cumulative, it was uniquely exculpatory.
B
The court and concurrence do not embrace the government’s “cumulative” submission. Toward the end of its opinion, however, the court suggests that the pre-October 5 email is cumulative for different reasons not pursued by the government. Maj. Op. at 986-88.[2] The court’s argument centers on the October 18 meeting between Mr. Ford and Mr. Heavilin in which Mr. Heavilin expressed a desire to purchase a third weapon. From this meeting, the court reasons that, even without the suppressed pre-October 5 email, the jury was free to infer that Mr. Heavilin instigated the third gun sale. Maj. Op. at 987-88.
It appears the government did not pursue this argument before us for a good *997 reason. The court’s citations to the record merely show that, at the October 18 meeting, Mr. Heavilin said he wanted to purchase a third gun and was ready to proceed; there is no evidence suggesting that the first discussion of a third gun sale took place at the October 18 meeting. In fact, the jury heard that Mr. Ford and Mr. Heavilin had at least seven contacts (excluding the suppressed emails) after the second weapon sale and before the October 18 conversation. See Aplt. Op. Br. Attachment 1 (Exhibit 11 at trial). The jury also had before it the October 5 email suggesting that the idea for a third gun sale originated with Mr. Ford. See Dist. Ct. Op. at 13.[3] Simply put, without the suppressed pre-October 5 email, the record leaves the unmistakable impression that the earliest contact between the parties about a third gun sale was the October 5 email — an email which, without the context of its predecessor, plainly (and erroneously) suggests Mr. Ford instigated the third sale.[4]
C
Ultimately, my colleagues devote most of their effort to a different argument, suggesting that, even if the government suppressed evidence showing that Mr. Ford did not initiate the idea for a third gun sale, other evidence before the jury conclusively demonstrates Mr. Ford’s predisposition to possess or transfer a third gun. Maj. Op. at 985; Concurrence at 989. Because the government’s evidence proves predisposition, my colleagues reason, any suppressed evidence regarding initiation is immaterial.
I concur entirely with the premise on which this argument proceeds: the government was free to disprove entrapment in three different ways, as enumerated in Jury Instruction 22, and so could have succeeded by showing Mr. Ford was predisposed to engage in the charged crime, even if he did not initiate conversations about it. See supra Section I (citing Jury Instruction 22). Nonetheless, for the following reasons I am unable to agree with the conclusions my colleagues reach from this shared premise.
1
Initiation and predisposition cannot be as neatly separated as the court’s argu *998 ment assumes. What is material to one is often material to the other. Under our governing precedents, a defendant’s predisposition must be viewed “at the time the government agent first approached the defendant.” United States v. Garcia, 182 F.3d 1165, 1169 (10th Cir.1999). Although “inferences” about predisposition surely may be drawn from events occurring after the initial contact, id., and the question of initiation is different from the question of predisposition, we must assess predisposition in this case at the time when Mr. Heavilin first approached Mr. Ford concerning the third gun sale. Given this, I do not see how the undisclosed pre-Octo-ber 5 email to Mr. Ford, in which he “exhorted” Mr. Ford to find a third gun, could possibly be immaterial as a matter of law to a proper analysis of Mr. Ford’s predisposition at the time Mr. Heavilin approached him, even if it does not suffice standing alone to preclude predisposition. Shifting focus to predisposition simply does not negate the materiality of the suppressed email.
2
My colleagues’ predisposition discussion focuses exclusively on the government’s evidence on count 3. Maj. Op. at 985-87; Concurrence at 989-90. Yet, there is considerable countervailing evidence in the record that my colleagues do not mention, and they do not explain why they credit the government’s evidence rather than the (unmentioned) evidence presented by the defense. Respectfully, I believe proceeding in this fashion is inconsistent with our role in reviewing Brady challenges.
To be sure, in considering the materiality of suppressed evidence in a Brady challenge, we may not ignore evidence suggesting a defendant’s guilt. But what we also may not do is asymmetrically scan the trial record for signs that the defendant is guilty. A Brady challenge is not, and should not be confused with, a sufficiency of the evidence challenge — a point the Supreme Court has repeatedly underscored. See Kyles, 514 U.S. at 434-35, 115 S.Ct. 1555. In a Brady challenge our obligation is to determine whether the verdict is worthy of the confidence of the judicial system in light of the suppressed evidence, when viewed “in the context of the entire record.” Agurs, 427 U.S. at 112, 96 S.Ct. 2392. Thus, in Kyles the Supreme Court did not hesitate to consider the totality of the evidence in the record, exculpatory and inculpatory, and, in concluding the suppressed evidence at issue was material, the Court stressed that, while the jury could well still have found the defendant guilty in light of the considerable evidence amassed by the government, this fact simply was not dispositive of the question before it. 514 U.S. at 453, 115 S.Ct. 1555.[5]
*999 3
The court’s misapplication of the Brady standard of review is also revealed in its exclusive focus on the government’s evidence on count 3 without reference to the jury’s disposition on counts 1 and 2. The court recites the government’s predisposition evidence on count 3 and then proceeds to hold it convincing. The difficulty is that the jury evidently did not find the very same evidence convincing. At trial, the government’s predisposition evidence was materially identical across all three counts. And we know that the jury rejected that evidence on counts 1 and 2.[6] I do not see how evidence of predisposition that the jury found insufficient to sustain a conviction on counts 1 and 2 can be evidence worthy of our confidence to sustain a conviction on count 3. I do not question that the government’s evidence on count 3 may have been sufficient to sustain a conviction, or that it may prove persuasive to a jury on retrial. But those are not the questions before us.
4
An examination of the specific evidence cited by the court and concurrence highlights my preceding concerns.[7]
First, the court argues that Mr. Ford was “eager” to sell the weapon despite “diminished pressure” from Mr. Heavilin. Maj. Op. at 984. In support of this claim, the court points to a November 17 conversation in which Mr. Heavilin told Mr. Ford that another dealer-friend might be willing to sell him a machine gun, two days after which Mr. Ford called Mr. Heavilin with news he had found a weapon. Id. The court, however, offers no record citations to support its assertions that Mr. Ford was “eager” to complete the sale, or that the pressure on him was diminished as a result of the conversation, and these conclusions appear only to be inferences in the government’s favor. In fact, contrary evidence, unmentioned by the court, exists in the record suggesting that Mr. Ford was no more or less “eager” to complete this sale than either of the previous sales on which he was acquitted. See R. Vol. XIV at 29, 35-38 (testimony of Mr. Ford). Record evidence even suggests that Mr. Heavilin’s actions could have increased Father than diminished pressure on Mr. Ford. See R. Vol. XIV at 163 (psychological testimony). The court offers us no reason to suggest that we can confidently pick one competing line of evidence over another.
Second, the court argues that Mr. Ford’s predisposition is demonstrated by his insistence upon completing the third transaction, despite being told by Mr. Heavilin that he did not need to do so, as well as by his use of a decoy gun. Maj. Op. at 985. But the government’s evidence on this score was identical across all three counts. For example, in its closing argument, the government expressly contended that, “contrary to the defendant’s theory of entrapment, Keith Heavilin, before each of the three machine gun sales, told the defendant, if you are stressed, don’t do it. If the safety issue is a con *1000 cern, don’t do it.” R. Vol. XV at 161 (emphasis added); see also R. Vol. VI at 11-13; R. Vol. IX at 163. Likewise, the government’s closing argument emphasized that Mr. Ford engaged in counter-surveillance (of which the use of a decoy is one example) before each of the three gun transactions. See R. Vol. XV at 167; see also R. Vol. VI at 9-10; R. Vol. XI at 166; R. Vol. IV at 37; R. Vol. XIV at 62. I fail to see how we can safely sustain a conviction on count 3 relying on evidence the jury evidently rejected on counts 1 and 2.
Third, the court contends predisposition is established by the fact that Mr. Ford “for the first time” with the third machine gun sale “thought he would make a decent profit.” Maj. Op. at 985. Yet, the court makes no mention of the fact that the evidence at trial showed Mr. Ford’s profits on the second and third sale were similar, not different: Mr. Ford testified that he “probably made a couple of hundred dollars” on the second sale, R. Vol. XIII at 124, and $400 on the third sale, see R. Vol. XIV at 37; R. Vol. XIII at 111.
Fourth, the court argues that “[b]y the time the third sale occurred, ... any previous entrapping influence ... had dissipated,” and that there were “fewer contacts” before the third sale than before the first two sales. Maj. Op. at 985. While I fully agree with the court that we cannot presume entrapment on the third count simply because entrapment was found on the first two counts, see United States v. Nguyen, 413 F.3d 1170, 1181 (10th Cir.2005), this undisputed legal principle does not obviate the need to analyze independently the evidence tending to prove or disprove Mr. Ford’s entrapment with respect to count 3. And, again, the evidence on count 3 with respect to predisposition at trial was no different in kind or quality than the evidence the jury rejected on counts 1 and 2.[8]
Fifth, the court and concurrence contend that the government produced evidence at trial indicating Mr. Ford possessed the third weapon “long before” Mr. Heavilin asked to buy it. The length of this period, the reasoning goes, tends to undercut any inference that the government’s informant entrapped Mr. Ford into procuring the weapon, and tends to show that Mr. Ford unlawfully possessed it on his own volition. Maj. Op. at 985-86; Concurrence at 989-90.
My colleagues begin by placing great weight on Mr. Hee’s testimony that Mr. Ford possessed the third gun several months before its sale. Yet, they make no mention of the fact that Mr. Hee testified that he saw both of the guns that were the subject of sales 2 and 3 in Mr. Ford’s possession months before the sales, see R. Vol. XI at 13-15; 72-77; 104-105, and that the FBI list the concurrence points to as corroboratory documentary evidence of his testimony also included both those weapons, see R. Vol. XI at 21. If Mr. Hee’s testimony and the FBI list were as convincing as my colleagues suggest, surely the jury would have convicted on count 2. But the jury did not. And it was plainly free not to do so in light of competing *1001 evidence calling into question Mr. Hee’s credibility that goes unnoted by my colleagues. See R. Vol. XIV at 29, 37-38 (Mr. Ford denying Mr. Hee’s assertions); R. Vol. XIV at 141-45 (testimony of private investigator Ed O’Connor questioning Mr. Hee’s observations). Unless we may view and credit the government’s evidence in isolation, and then disregard the fact that much of it was rejected by the jury on other counts, it is hard to see how we can conclude that Mr. Hee’s testimony unshakably confirms that Mr. Ford possessed the third gun before being induced by the government’s informant into procuring it.[9]
The court and concurrence next cite the testimony of Detective William Gallegos and Special Agent Brian Schmitt, who testified that Mr. Ford admitted in an interview to possessing the AR-15 for some time before the third sale. Maj. Op. at 986-87; Concurrence at 989-90. But, here again, neither the court nor the concurrence pauses to mention that Mr. Ford denied making any such admission. See, e.g., R. Vol. XIV at 80-81. And neither explains why we can confidently presume that Messrs. Gallegos and Schmitt are correct and Mr. Ford is not. This is surprising given the district court’s undisturbed and sensible finding that the disclosure of the pre-October 5 email “went to credibility because to some extent [it] contradicted ... Agent Schmitt’s testimony that the idea and opportunity for the third machine gun came from the defendant.” Dist. Ct. Op. at 11.
Finally, my colleagues note Rick Tar-vin’s testimony that he never sold an AR-15 to Mr. Ford. They argue that this evidence tends to undercut Mr. Ford’s testimony that he obtained part of the AR-15 from Mr. Tarvin only shortly before the third sale and only in response to Mr. Heavilin’s urging. See Maj. Op. at 986-87. From this, my colleagues infer that Mr. Ford must have possessed the weapon for some time, and was predisposed to possess it without prompting from the government’s informant. Again, however, the court gives no reason why we should have any more confidence in Mr. Tarvin’s testimony than Mr. Ford’s. And, in fact, an opposite conclusion is at least equally plausible. Mr. Tarvin testified that he never sold Mr. Ford any machine gun, see R. Vol. XIV at 217, while Mr. Ford testified that he purchased all three of the weapons that were the subjects of counts 1, 2, and 3 from Mr. Tarvin, and did so only at Mr. Heavilin’s urging, see R. Vol. XIV at 36-37; R. Vol. XIII at 105; see also R. Vol. XV at 160 (defense counsel’s closing arguments). Had the jury believed Mr. Tar-vin’s testimony, it would have found that Mr. Ford possessed all three weapons from other sources; did so well before *1002 making any sales to Mr. Heavilin; and thus was not entrapped into possessing or selling the weapons. Yet, the jury acquitted Mr. Ford of unlawfully possessing or transferring the first and second weapons. It follows that the jury may very well have rejected Mr. Tarvin’s testimony and accepted Mr. Ford’s testimony on where he obtained the guns from — testimony that comports with his overarching contention that he came into possession of each weapon only as a result of Mr. Heavilin’s overweening influence. The court and concurrence make no effort to explain why we can confidently discount this possibility so strongly suggested by the evidence.[10]
* * *
The only meaningful evidentiary difference between the counts on which Mr. Ford was acquitted and convicted was the fact that, at trial, the government was able to show that Mr. Ford, rather than its informant, initiated discussions over the third gun sale. We now know, however, that Mr. Ford did not initiate the third gun sale: the suppressed pre-October 5 email definitively proves that. In these circumstances, I am compelled to conclude that the suppressed email was material to the question of entrapment, that its suppression deprived Mr. Ford of a fair trial, and that the resulting verdict does not deserve our confidence. With respect for the considered views of my colleagues, I dissent.

. We do not know the date of this email except that it was sent before October 5. I follow the court’s convention in referring to this email as the "pre-October 5” email.

. It is our general practice not to adduce arguments for represented parties that they have not themselves raised at any stage in the proceedings, see, e.g., Headrick v. Rockwell Int’l Corp., 24 F.3d 1272, 1277-78 (10th Cir.1994), and the court does not offer any reason for departing from our general practice in this case.

. The court contends that we cannot “place great weight on the exact wording” of the October 5 email in part because Mr. Ford never used it "to cross-examine Heavilin or to establish that he was responding to one of Heavilin's earlier requests (by email or phone) for a gun.” Maj. Op. at 987. But surely we cannot fault a defendant for failing to highlight inculpatory evidence.

. The court agrees that the government argued to the jury that Mr. Ford initiated the third gun sale. See Maj. Op. at 987-88 & nn. 16-17. But the court then seeks to downplay the significance of this fact by suggesting the government's argument on this score was "fleeting” and "brief” and therefore evidence — namely the suppressed pre-October 5 email — definitively and conclusively proving the government wrong on this score is immaterial. Id. With respect for my colleagues' views, I cannot see how a piece of evidence that resolves a "central question” of Mr. Ford's defense that was disputed at trial can be immaterial as a matter of law. See supra Part I. Notably, too, neither the government nor the district court has suggested affir-mance would be appropriate on the ground now offered by my colleagues. To the contrary, the district court unreservedly found that the government argued and put on evidence seeking to prove that Mr. Ford initiated the third gun sale; I see no reason or authority allowing us effectively to alter and effectively undo that finding. See Dist. Ct. at 3 ("As to count 3 ... the government contended that there was no entrapment by Mr. Heavilin because the idea and impetus for the third illegal weapon came from the defendant.”); id. at 11 (Mr. Heavilin and Agent Schmitt testified that "the idea and opportunity for the third machine gun came from the defendant ‘out of the blue.’ ”).

. The court takes pains to represent that it has "conducted a review of the entire record.” Maj. Op. at 984 n. 12. I do not for a moment mean to suggest otherwise. My concern is not with the thoroughness of the court’s review of the record, but with what it does with that record — namely, outline facts and draw inferences in the light most favorable to the government. This is our mode of operation in a sufficiency review, not a Brady challenge.
The concurrence's reliance on Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), and several other cases in the Griffin line serves to underscore the problem. Griffin was no Brady case; rather, it simply announced the following rule; "[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, as Turner's indictment did, the verdict stands if the evidence is sufficient with respect to any one of the acts charged.” Id. at 56-57, 112 S.Ct. 466 (emphasis added). This standard has no place in a Brady challenge where we look not at the sufficiency of the government’s evidence to support a guilty *999 verdict on the charged elements, but to the fundamental fairness of the trial.

. Of course, the government secured a conviction on count 3. But it appears the government did so only because on that count alone, and only by virtue of its suppression of the pre-October 5 email, it could argue that Mr. Ford initiated the idea of the gun sale.

. Separately but not insignificantly, several of the following arguments the court and concurrence make were not briefed by either party or considered in the district court’s order. See Appellee Br. at 15 (setting forth only reasons three, four, and part of one). Our normal practice would counsel against raising and considering them. See supra n. 2.

. In this section of its opinion, the court adds that “the substance of Ford’s October 5 email shows he was responding to Heavilin’s request for a gun, thus allowing Ford to convincingly argue the government initiated the idea of the third sale.” Maj. Op. at 985. But this argument does not supply an independent reason for finding predisposition, even if Mr. Heavilin initiated discussions of the third gun sale. Rather, it simply returns us to the government's (mistaken) argument that the suppressed pre-October 5 email is cumulative evidence with respect to who, in fact, initiated the third sale. As the government itself concedes, the October 5 email simply does not prove, by inference, that Mr. Heavilin initiated the third sale. See supra Section II.A.

. In a footnote, the court disputes that possession evidence was materially identical across counts two and three. Maj. Op. at 986 n. 13. Yet in support of this point, the court simply seeks to bolster Mr. Hee's testimony, stressing that he had “both longer and more significant contact with the third machine gun” because he testified to having seen the third gun two years prior to the sale and to having fired the third gun. Id. I cannot subscribe to this analysis for two reasons. First, the length of time a defendant possesses a gun is irrelevant to whether he is guilty of 18 U.S.C. § 922(o). Second, with respect to Mr. Hee’s testimony that he fired the third weapon, the court again seems to conflate a sufficiency claim with a Brady claim. The court makes no mention of competing evidence from a private investigator, Ed O’Connor, who testified that in a pre-trial interview with Mr. Hee, Mr. Hee stated that he never shot the third gun. See R. Vol. XIV at 141. Neither does it mention similar testimony from Mr. Ford. See R. Vol. XIV at 47 (Mr. Ford testifying he never shot an AR-15 automatic with Mr. Hee). Finally, and most importantly, the court does not explain why we can or should credit Mr. Hee's version of events over Mr. O'Connor’s or Mr. Ford’s.

. Mr. Ford also presented evidence that Mr. Tarvin had a past felony conviction and argued from this fact that Mr. Tarvin would be even more reluctant than the typical citizen to admit to having illegally sold weapons for fear of a particularly harsh sentence. See R. Vol. XV at 20-22; see also Jury Instruction No. 7 (informing jury that Mr. Tarvin’s testimony “may be discredited or impeached by showing that he previously has been convicted of a felony”).