FILED
United States Court of Appeals
Tenth Circuit

August 15, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

MICHAEL CRAIG COOPER,

      Defendant-Appellant.

No. 10-3105

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:04-CR-20105-CM-JPO-1)**

---

John Jenab of Jenab & McCauley, LLP, Olathe, Kansas, for Defendant-Appellant.

Scott C. Rask, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), Kansas City, Kansas, for Plaintiff-Appellee.

---

Before **HOLMES** and **BALDOCK**, Circuit Judges, and **JOHNSON**, District Judge.[*]

---

**HOLMES**, Circuit Judge.

---

[*] United States District Judge William P. Johnson of the District of New Mexico, sitting by designation.

## INTRODUCTION

Defendant-Appellant Michael Craig Cooper was convicted by jury of one count of conspiracy to defraud, multiple counts of mail and wire fraud, one count of conspiracy to commit money laundering, two counts of money laundering, and multiple counts of engaging in monetary transactions in property derived from unlawful activity. During the proceedings below, Mr. Cooper filed several motions with the district court, including motions for a judgment of acquittal, a post-verdict motion for a new trial, and a motion to suppress evidence under the Fourth Amendment. The district court denied them all. On appeal, Mr. Cooper challenges the district court's denial of his motions for a judgment of acquittal, his motion for a new trial, and his motion to suppress. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## FACTUAL BACKGROUND

Mr. Cooper was the founder, president, and chief executive officer of Renaissance, The Tax People, Inc. ("Renaissance"), which he founded in 1995. Beginning in 1997, Renaissance developed, marketed, and sold tax materials aimed at home-based business owners. More specifically, Renaissance sold a tax package called the Tax Relief System ("TRS"), which "included a written manual and set of accompanying audiotapes setting forth the general guidelines and rules applicable to the wide array of tax deductions available to owners of home-based businesses." Aplt. Opening Br. at 7; *see also id.* at 4 (stating that the TRS

"consisted of a plastic clamshell containing a booklet and audiotapes summarizing tax deductions available to owners of a home-based business").[1]  The TRS sold for $300.

Renaissance also sold a bundle of services called the Platinum Tax Advantage ("PTA"), which purported to provide Renaissance users with unlimited tax advice and unlimited representation in the event of a tax audit.  The tax advice and representation were provided by "tax professionals affiliated with Renaissance."  *Id.* at 4.  The PTA was provided for a monthly fee of $100.

Renaissance operated through a network of independent sales representatives called Independent Marketing Associates ("IMAs").  The IMAs both sold Renaissance products and recruited new IMAs.  IMAs earned commissions on both their own sales "and on sales by the downline of [IMAs] generated through their recruitment efforts."  *Id.* at 6.  However, IMAs were "required . . . to pay [Renaissance] $100 per month to receive commissions and bonuses based on recruitment of new IMAs," R., Vol. 1, at 60 (Indictment, filed Aug. 13, 2004)—that is, IMAs had to "pay to play," Aplee. Br. at 36.  In addition, "[IMAs] who sold the Tax Relief System as a home-based business were then able to utilize the tax deductions outlined in the system."  Aplt. Opening Br. at 4.  Essentially, the Renaissance network was what is known as a "pyramid

---

[1]  Earlier versions of the TRS included the "Tax Pack," which Renaissance marketed and sold in 1997, and the "Tax Advantage System," which Renaissance marketed and sold in 1998 and 1999.  Aplt. Opening Br. at 7.

scheme[].”  R., Vol. 1, at 52.

Renaissance also launched the Affiliated Tax Professional Network ("ATPN"), a group of tax professionals specializing in home-based businesses who served as a resource for Renaissance customers and IMAs and offered discounted tax-preparation services to Renaissance members.  "[T]o join the ATPN, a tax professional was required to . . . submit a written endorsement of the Tax Relief System, pass a written exam . . . , agree to provide tax services at a discounted rate to Renaissance members, and become an IMA."  Aplt. Opening Br. at 16 (citations omitted).  According to Mr. Cooper, "[t]he idea behind the ATPN . . . was to increase the professionalism of the company . . . by putting together a group of knowledgeable and experienced tax practitioners who understood the tax laws as they relate to home[-]based business."  *Id.* at 17.  By 2002, "Renaissance had in its possession over 2,000 written letters of endorsement from tax professionals all over the country."  *Id.*

Renaissance also developed a W-4 Exemption Increase Estimator tool ("W-4 Estimator"), which was used "to adjust W-4 withholdings to reflect anticipated losses when one starts a home business."  *Id.* at 24–25.  The estimator was a "work sheet" that was "used as a tool by [IMAs] to help people adjust their [W-4s] for their newfound business deductions."  R., Vol. 3, at 373 (Trial Tr., dated Feb. 1, 2008).  The tool served to help Renaissance IMAs to improperly "increase the number of exemptions" that could be claimed so that their "take

4

home pay w[ould] increase." *Id.* at 373–74. In other words, through the W-4 Estimator, Renaissance improperly "[e]mphasized the conversion of personal expenses into deductible business expenses," R., Vol. 1, at 59, which decreased IMAs' tax liability.

Through the TRS, PTA, ATPN, and W-4 Estimator, Renaissance purported "to provide tax advice [and services] that would help individuals with home-based businesses." Aplee. Br. at 9. However, as the company grew, it "expanded into a scheme to enable anyone associated with Renaissance [e.g., IMAs] to avoid paying taxes on their W-2 income through the use of the 'W-4 Exemption Increase Estimator' and the fraudulent claim of tax deductions." *Id.* Mr. Cooper's co-conspirators testified that they prepared false or fraudulent tax returns for Renaissance customers and IMAs by "ignor[ing] the tax code's requirement that only 'ordinary and necessary' expenses may be included as deductions." *Id.* These tax returns "overstated IMAs' personal expenses as business deductions," and "contained excessive amounts of 'expenses' with essentially no income." *Id.* at 9–10. Personal expenses including vacations, "'wages'/allowance paid to children," commuting miles, and "unreasonable percentage use of the home for business purposes" were improperly and illegally deducted as business expenses. *See id.* at 9–12. Several of Mr. Cooper's co-conspirators also testified that the preparation of false or fraudulent tax returns and the creation of promotional tools and materials that contained false or

5

erroneous tax advice—all of which were "consistent with the fraudulent tax advice espoused by [Mr. Cooper] and . . . Renaissance," *id.* at 9—were carried out despite the fact that many Renaissance affiliates had brought their concerns regarding this false advice and fraudulent activity to Mr. Cooper's attention.

Despite the red flags, the business continued to grow and accumulate more IMAs. By October 2000, Renaissance had recruited approximately 55,000 IMAs and was bringing in approximately $10 million a month.

On October 11, 2000, law enforcement agents of the Internal Revenue Service ("IRS") and the U.S. Postal Inspection Service executed search warrants on Renaissance's warehouse, headquarters, accounting center, call and mailing operations center, and on Mr. Cooper's safe deposit box, as well as seizure warrants on various bank and investment accounts associated with Mr. Cooper and Renaissance. As the investigation progressed over the next two months, several additional seizure warrants were authorized and executed on various accounts associated with the company and Mr. Cooper. Finally, in April 2001, a search warrant was authorized and executed on Mr. Cooper's residence in Topeka, Kansas.

## PROCEDURAL HISTORY

On August 13, 2004, a grand jury returned a 148-count indictment naming Mr. Cooper, Renaissance, and co-conspirators Jesse Ayala Cota, Todd Eugene Strand, and Daniel Joe Gleason. Mr. Cota, who is a former IRS employee, was

Renaissance's "national tax director from June 1999 until after the government raids [in 2000]," Aplt. Opening Br. at 5, and managed the company's "Tax Dream Team" from July 1999 through May 2001, R., Vol. 1, at 50.[2] Mr. Strand—whom the government described as Mr. Cooper's "right-hand man"—was Renaissance's "Vice-President of Marketing," *id.*, and "national marketing director from the inception of the company until after the October 2000 raids," Aplt. Opening Br. at 5. Mr. Gleason was Renaissance's "national tax director from March 1998 until mid-1999." *Id.* As the national tax director, Mr. Gleason also served as the "Director of the Tax [Dream] Team." R., Vol. 1, at 50.

The indictment alleged that Renaissance was a fraudulent pyramid scheme, and that Mr. Cooper and his co-conspirators had conspired to defraud the IRS, Renaissance customers, and IMAs through the company's false tax material and fraudulent operations (e.g., the preparation of false tax returns for IMAs). Specifically, the indictment charged Mr. Cooper with: one count of conspiracy to defraud (by impeding the functions of the IRS in computing and collecting taxes, committing mail fraud, and committing wire fraud), in violation of 18 U.S.C.

---

[2]    "The chief architect behind the creation of the Tax Dream Team was [co-conspirator] Todd Strand." Aplt. Opening Br. at 16 n.2. Mr. Cota took over as the leader of the Tax Dream Team when he joined Renaissance as its national tax director in 1999. *Id.* The Tax Dream Team was "a group of individuals promoted by Renaissance as tax experts." R., Vol. 1, at 50. The team "had the final word on all tax advice given by the company" and, under the direction of Mr. Cota, was responsible for building the ATPN and rewriting the TRS. Aplt. Opening Br. at 16 n.2, 18, 21.

7

§ 371 (Count 1); fifty-six counts of assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2) and 18 U.S.C. § 2 (Counts 2–57); thirty-six counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 2 (Counts 58–93); eleven counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 94–104); one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h) (Count 105); forty-one counts of engaging in monetary transactions in property derived from unlawful activity, in violation of 18 U.S.C. §§ 1957 and 2 (Counts 106–46); and two counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(I) and 2 (Counts 147–48).

On December 7, 2006, the grand jury returned a 148-count superseding indictment. The superseding indictment "removed some sentencing guideline enhancements, corrected some typographical errors, and removed Dan Gleason, who had by that time entered into a plea agreement with the government, as a named defendant." Aplt. Opening Br. at 2 (citation omitted). However, the superseding indictment did not add to, remove, or otherwise alter the charges brought against Mr. Cooper.

Prior to trial, Mr. Cooper filed a motion to suppress, arguing that the searches and seizures executed with regard to Mr. Cooper and Renaissance violated the Fourth Amendment.[3] More specifically, Mr. Cooper's motion

---

[3] In his suppression motion, Mr. Cooper challenged the "eleven federal search warrants—four general warrants for seizure of business records and seven
(continued...)

8

"challenge[d] the searches and seizures executed against [him] and [Renaissance] on October 11, 2000[,] on the grounds that the warrant affidavits lacked probable cause [and] the search warrants were overbroad," and challenged "[t]he remaining seizures . . . as fruit of the poisonous tree," as well as "all other evidence obtained through or as a result of the unconstitutional seizures." R., Vol. 1, at 137 (Reply Mem. in Supp. of Mot. to Suppress, filed Sept. 22, 2006) (citations omitted).[4] In the event that the court concluded that the "affidavits and warrants survive[d] constitutional scrutiny on their face," Mr. Cooper's motion requested "a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978)[,] for the purpose of establishing that the 'facts' and assertions in the affidavits . . . were false, and were made by the agents in knowing and reckless disregard of their falsehood." *Id.* at 135–36.

---

[3](...continued)
warrants for seizure of bank accounts—[executed] on October 11, 2000." R., Vol. 1, at 118 (Mot. to Suppress, filed June 29, 2006). Mr. Cooper's motion did not appear to challenge the search warrant for his safe deposit box.

In his reply brief, however, Mr. Cooper sought to challenge all twelve of the searches and seizures that were executed on October 11, 2000. Moreover, the government's response characterized Mr. Cooper's motion as "seek[ing] suppression of all evidence seized pursuant to the search and seizure warrants served on October 11, 2000." R., Vol. 1, at 148.

[4]    Mr. Cooper also averred that "[t]he warrants . . . violate[d] the Fourth Amendment on the separate ground that the information contained in the affidavits was stale." R., Vol. 1, at 133. The district court rejected this argument, and Mr. Cooper has not raised it as a separate claim on appeal. Consequently, we need not consider it here.

The district court orally denied Mr. Cooper's motion to suppress at a hearing held on November 20, 2006. First, the court concluded that the search warrants were supported by probable cause because the "affidavits state facts, not just conclusions, and provided the magistrates with the opportunity to make an independent evaluation of the allegedly false and misleading claims," and the "[f]acts set forth in the affidavits support the magistrates' findings that there was a fair probability that warrants would uncover evidence of tax and mail fraud." R., Vol. 2, at 54 (Mot. Hr'g Tr., dated Nov. 20, 2006).[5] Second, the court rejected Mr. Cooper's argument that the warrants violated the Fourth Amendment's particularity requirement because they were overbroad, having found that the warrants were "sufficiently limited and specific in view of the crimes that were being investigated." *Id.* at 55. Finally, the court denied Mr. Cooper's request for a *Franks* hearing on account of his failure to "ma[ke] a substantial preliminary showing that the agents knowingly or recklessly withheld information from the magistrates or that the allegedly false statements were necessary to the finding of probable cause." *Id.* at 56. Mr. Cooper then filed a

---

[5]     The district court alternatively held that "even if . . . probable cause was lacking, [it] would still deny [Mr. Cooper's] motion to suppress based upon [*United States v. Leon*, 468 U.S. 897 (1984)], wherein the Supreme Court held that when police officers act in good faith and reasonably rely on a search warrant, the evidence obtained during the search should not be suppressed even if the warrant was lacking in probable cause." R., Vol. 2, at 56. The court concluded that *Leon*'s "good faith" exception applied because "the officers . . . in this case acted in good faith, and the warrant contained sufficient information for a reasonable officer to believe that [the] warrant [was] valid." *Id.*

motion asking the court to reconsider its denial of a *Franks* hearing, which the district court denied.

Mr. Cooper's co-defendants—Mr. Cota, Mr. Strand, and Mr. Gleason—all pleaded guilty and testified at Mr. Cooper's trial pursuant to their cooperation agreements. Mr. Cooper moved for judgment of acquittal under Federal Rule of Criminal Procedure 29 both after the government rested, *see* R., Vol. 4, at 91–92 (Trial Tr., dated Feb. 14, 2008) ("[T]he defense would move for judgment of acquittal on all counts in the superseding indictment."), and after the close of all the evidence, *see id.* at 639 ("I would like to renew my motion for judgment of acquittal at this time."). The district court denied both motions.

On February 28, 2008, the jury returned a verdict convicting Mr. Cooper on the one count of conspiracy to defraud (Count 1), seventeen of the thirty-six counts of mail fraud (Counts 58–61, 66, 68–69, 74, 76, 78–79, 83, 87–88, 91–93), all eleven counts of wire fraud (Counts 94–104), the one count of conspiracy to launder money (Count 105), all forty-one counts of engaging in monetary transactions in property derived from unlawful activity (Counts 106–46), and both counts of money laundering (Counts 147–48). The jury acquitted Mr. Cooper of all fifty-six counts of assisting in the preparation of false tax returns (Counts 2–57), and nineteen of the thirty-six counts of mail fraud (Counts 62–65, 67, 70–73, 75, 77, 80–82, 84–86, 88–90).

Mr. Cooper again renewed his motion for judgment of acquittal after the

11

jury returned its verdict.[6] Mr. Cooper's motion—filed without a supporting brief—was a general motion for judgment of acquittal. However, Mr. Cooper filed a reply brief in support of his motion that significantly limited his contentions, at least arguably transforming his motion from a general one into a specific one. In particular, Mr. Cooper limited his motion to challenging the sufficiency of the evidence *only* as to Count 1—the count for conspiracy to defraud—reasoning that the government had "failed to prove a criminal conspiracy as alleged in Count One," and that "if the evidence was insufficient to

---

[6] The district court concluded that Mr. Cooper had "not contest[ed] his conviction on Count 66," R., Vol. 1, at 448 n.1 (Mem. & Order, filed Apr. 14, 2009), because he had omitted Count 66 both when he recited his counts of conviction and when he asserted that "no rational juror could have found Mr. Cooper guilty of any of counts 1, 58–61, 68–69, 74, 76, 78–79, 83, 87–88, or 91–148 of the Superseding Indictment." *Id.* at 403 (Mot. for J. of Acquittal, filed Apr. 10, 2008). The better view, however, is that Mr. Cooper's motion did challenge his conviction on Count 66, but that he inadvertently omitted Count 66 when enumerating the challenged counts. In his motion for judgment of acquittal, almost immediately *before* the enumeration of counts, Mr. Cooper expressly states that "defendant . . . moves for judgment of acquittal on *all counts of conviction* in this case." *Id.* (emphasis added). Similarly, in his reply brief regarding this matter, Mr. Cooper concludes his arguments by clearly noting that "[j]udgment of acquittal must be entered *as to each count of conviction* in this case." *Id.* at 447 (Def.'s Reply Mem. in Supp. of Mot. for J. of Acquittal, filed Feb. 12, 2009) (emphasis added). The record allows for no dispute that Count 66 *was* one of Mr. Cooper's counts of conviction. *Id.* at 391 (Verdict Form, filed Feb. 28, 2008). Therefore, Mr. Cooper's general attack on his counts of conviction seemingly would have included a challenge to Count 66. Furthermore, as a legal matter, there was nothing to significantly distinguish Count 66 from the other mail fraud counts. In other words, as the district court recognized, "the same analysis [would] appl[y]" *id.* at 448 n.1, to Count 66 as to the other mail fraud counts. Therefore, we cannot discern any logical reason why Mr. Cooper would have intentionally omitted Count 66 from his motion for judgment of acquittal, which challenged his other mail fraud counts of conviction.

12

convict [Mr.] Cooper on Count One, all of the other convictions must be vacated as well." R., Vol. 1, at 435, 446. In other words, Mr. Cooper's reply brief made clear that his motion pertained solely to the count for conspiracy to defraud, because each of the additional counts "depend[ed] upon the validity of the guilty verdict on Count One." *Id.* at 434–35. Mr. Cooper raised no independent challenge in his reply brief to the sufficiency of the evidence on the remaining counts of conviction.

The district court denied Mr. Cooper's motion, holding that the "evidence was sufficient for the jury to find that defendant knowingly and voluntarily entered into an agreement with his coconspirators to defraud the United States and commit wire and mail fraud as alleged in count 1." R., Vol. 1, at 452. Because Mr. Cooper's "challenge to the remaining convictions [wa]s dependant on his argument that there [wa]s insufficient evidence to convict him on count 1," the court also held there was sufficient evidence to support those convictions. *Id.*

On June 17, 2009—more than fifteen months after the jury returned its verdict—the government sent Mr. Cooper discovery indicating that Mr. Gleason "was engaging in ongoing frauds against the government and the public from before the time of his guilty plea in this case and continuing through and after the trial." Aplt. Opening Br. at 32. "[T]his additional information was several hundred pages of documents generated by the IRS . . . as part of [its] efforts to collect a $2.4 million tax debt owed by [Mr.] Gleason, which . . . established [that

13

Mr.] Gleason submitted false information to the IRS . . . and attempted to evade payment of his tax debt." Aplee. Br. at 25. More specifically, these discovery documents demonstrated that Mr. Gleason had engaged in fraudulent activity that included providing the IRS with false information about his income, concealing bank accounts, falsely encumbering assets, titling his businesses in the names of relatives, funneling income through accounts held in relatives' names, filing fraudulent and frivolous IRS forms, and making false claims via the Internet.

Based on this discovery disclosure, Mr. Cooper filed a motion for a new trial under Federal Rule of Criminal Procedure 33(b), arguing that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose this impeachment evidence. *See Brady*, 373 U.S. at 87 (holding that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within th[e] general [*Brady*] rule." (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959))). At the hearing on Mr. Cooper's motion for a new trial, the government conceded that it had suppressed the evidence and that the evidence was favorable to Mr. Cooper; therefore, the only issue before the district court was whether this evidence was "material." *See* R., Vol. 4, at 780 (Mots.

14

Hr'g Tr., dated Mar. 9, 2010) ("The government concedes that the court could find that the prosecution suppressed the evidence and that the evidence is favorable to defendant. Thus, the court need only to determine whether the evidence was material."). Mr. Cooper argued that the suppressed evidence was "material" because "[Mr.] Gleason was a key government witness . . . , the suppressed discovery reveals that [Mr.] Gleason gave perjured testimony at trial," R., Vol. 1, at 456, and "had the evidence been disclosed to the defense prior to trial, the government never would have presented [Mr.] Gleason as a witness," *id.* at 455.

The district court denied Mr. Cooper's motion, having concluded that there was "no reasonable probability that the evidence would have affected the fairness of defendant's trial." R., Vol. 4, at 781; *accord id.* at 785 ("In this case, the favorable evidence could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."). Mr. Gleason's testimony, the court explained, was neither "material" nor "critical" because it "was merely cumulative evidence of defendant's illegal activities." *Id.* at 783. Consequently, "because it [wa]s [merely] cumulative," this "newly disclosed evidence insignificantly impact[ed] the degree of [Mr. Gleason's] impeachment." *Id.* at 785.

On April 20, 2010, the district court sentenced Mr. Cooper to 240 months' imprisonment. This timely appeal followed.

15

**DISCUSSION**

**I.    Motion for Judgment of Acquittal: Sufficiency of the Evidence to Support Mr. Cooper's Convictions**

Mr. Cooper first claims that "[t]he evidence adduced at trial was insufficient to convict [him] of the charged offenses."  Aplt. Opening Br. at 35. He avers that there was insufficient evidence of an agreement to violate the law to support his conviction of conspiracy to defraud (Count 1).  Mr. Cooper also argues that the government presented insufficient evidence of a "scheme or artifice to defraud" to support the seventeen mail fraud convictions (Counts 58–61, 66, 68–69, 74, 76, 78–79, 83, 87–88, 91–93) and eleven wire fraud convictions (Counts 94–104).  Finally, Mr. Cooper argues that his remaining convictions were also supported by insufficient evidence, as these convictions derived from the conspiracy to defraud and mail and wire fraud convictions.

**A.    Standard of Review**

We review challenges to the sufficiency of the evidence and denials of motions for judgment of acquittal de novo.  *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004).  In so doing, we must examine "whether 'viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt.'"  *Id.* (quoting *United States v. Vallo*, 238 F.3d 1242, 1246–47 (10th Cir. 2001)).  However, we do not weigh conflicting evidence or consider

16

witness credibility, *id.*, and the fact that prosecution and defense witnesses presented conflicting or differing accounts at trial does not necessarily render the evidence insufficient, *see United States v. Shaffer*, 472 F.3d 1219, 1223 (10th Cir. 2007) ("[T]he jury was free to credit Special Agent Zimmer's testimony and discredit Mr. Shaffer's."); *see also United States v. Denny*, 48 F. App'x 732, 736 (10th Cir. 2002) (stating that evidence is not rendered insufficient merely because the "government and defense witnesses gave differing accounts at trial").

## B.    Conspiracy to Defraud Conviction (Count 1)

To convict a defendant of conspiracy under 18 U.S.C. § 371, the government must prove that: "(1) there was an agreement to violate the law, (2) the defendant knew the essential objective of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, (4) an overt act was committed in furtherance of the conspiracy, and (5) the coconspirators were interdependent." *United v. Bedford*, 536 F.3d 1148, 1156 (10th Cir. 2008); *accord United States v. Nall*, 949 F.2d 301, 305 (10th Cir. 1991).[7]  Mr. Cooper argues that the government failed to present evidence establishing the first element of conspiracy, an agreement to violate the law, because "none of [Mr.]

---

[7]      Our case law makes clear that "a conspiracy . . . does not [necessarily] require proof of an overt act" in all instances. *United States v. Fishman*, __F.3d__, 2011 WL 2084207, at *6 (10th Cir. May 27, 2011) (citing *Whitfield v. United States*, 543 U.S. 209 (2005)).  However, when a conspiracy charge is brought under § 371—the general conspiracy statute—the "overt act" requirement must be met.

Cooper's alleged co-conspirators—Cota, Strand, Gleason, Ruth, and Steelman—testified that they entered an illegal agreement with [Mr.] Cooper." Aplt. Opening Br. at 38. He insists that "each alleged co-conspirator testified to the exact contrary." *Id.*

Testimony by a co-conspirator that an illegal agreement was expressly entered into is *not* required to establish a conspiracy in this context. Rather, "[a]n agreement 'may be inferred from the facts and circumstances of the case,'" *United States v. Sells*, 477 F.3d 1226, 1236 (10th Cir. 2007) (quoting *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992)); in other words, the agreement requirement may be satisfied entirely through circumstantial evidence, *see, e.g.*, *United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000) (stating that an agreement "may be inferred entirely from circumstantial evidence"). Moreover, the jury is empowered to make credibility assessments: "resolution of conflicting evidence is exclusively within the discretion of the jury, as the trier of fact, and its verdict must be given added weight when the opportunity to hear and observe the witnesses is considered." *United States v. Vigil*, 743 F.2d 751, 752 (10th Cir. 1984). Thus, a jury is free to discredit any evidence contradicting the existence of an agreement.

In support of its contention that an agreement existed between Mr. Cooper and his co-conspirators, the government points to evidence and testimony demonstrating, *inter alia*: (1) that Renaissance "expanded into a scheme to enable

18

anyone associated with Renaissance to avoid paying taxes on their W-2 income . . . and [to] fraudulent[ly] claim . . . tax deductions" by ignoring the "ordinary and necessary" expenses requirement in the tax code, Aplee. Br. at 9; (2) that Mr. Cooper repeatedly offered false tax advice to promote Renaissance, despite the fact that many of his co-conspirators had brought concerns about the fraudulent nature of the business to his attention; (3) that the co-conspirators prepared false or fraudulent tax returns for IMAs, which were consistent with the fraudulent tax advice espoused by Mr. Cooper and Renaissance; and (4) that Renaissance's business continued to flourish, despite the fact that the conspirators—including Mr. Cooper—knew that the company's tax advice was false and that its tax work was fraudulent. On the basis of the foregoing evidence (among other evidence)— viewed in the light most favorable to the government—we conclude that a rational jury could have found that an agreement existed between Mr. Cooper and his co-conspirators to violate the law. Accordingly, we conclude that the government presented sufficient evidence to support Mr. Cooper's conviction under Count 1 for conspiring to defraud.

C.    **Mail Fraud and Wire Fraud Convictions (Counts 58–61, 66, 68–69, 74, 76, 78–79, 83, 87–88, 91–93)**

Next, Mr. Cooper argues that "the government failed to prove its contention that the Renaissance business was a scheme or artifice to defraud customers and [IMAs]," Aplt. Opening Br. at 39—in other words, he contends that the evidence

19

it presented regarding the mail and wire fraud charges (Counts 58 through 104) was insufficient. "The elements of federal mail fraud as defined in 18 U.S.C. § 1341 are (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of the mails to execute the scheme." *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003). "The first and second elements of federal mail and wire fraud are identical. The third element of wire fraud as defined in 18 U.S.C. § 1343 is the use of interstate wire or radio communications to execute the scheme"—that is, "the use of interstate wire or radio communications," instead of "the mails," to "execute the scheme." *Id.* (footnote omitted). "One may 'defraud' another within the meaning of §§ 1341 and 1343 by depriving another of property or 'the intangible right of honest services.'" *Id.* (quoting 18 U.S.C. § 1346). Mr. Cooper insists that the first element of the mail and wire fraud charge—"a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises"—was not satisfied here. Instead, he contends that "the evidence adduced at trial overwhelmingly established that Renaissance not only was a legitimate company, but one dedicated to achieving both excellence in its product and consistency and professionalism in its IMA sales force and affiliate network." Aplt. Opening Br. at 39.

### 1. Forfeiture

"[I]f a defendant files a general motion for acquittal that does not identify a

specific point of attack, the defendant is deemed to be challenging the sufficiency of each essential element of the government's case . . . ." *United States v. Kelly*, 535 F.3d 1229, 1234–35 (10th Cir. 2008).  On the other hand, "[w]hen a defendant challenges in district court the sufficiency of the evidence on specific grounds, all grounds not specified in the motion are waived," *id.* at 1234 (quoting *United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007)) (internal quotation marks omitted)—or, to be more precise, forfeited, *see Goode*, 483 F.3d at 681 ("When a defendant challenges in district court the sufficiency of the evidence on specific grounds, 'all grounds not specified in the motion are waived.'  Although we have described the failure to raise a challenge in district court as a 'waiver,' it is more precisely termed a forfeiture when there is no suggestion of a knowing, voluntary failure to raise the matter." (citations omitted) (quoting *United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003))); 2A Charles Alan Wright & Peter J. Henning, *Federal Practice and Procedure: Criminal* § 469 at 388 (4th ed. 2009) ("[I]f the defendant has asserted specific grounds in the trial court as the basis for a motion for acquittal, he or she cannot assert other grounds on appeal."); *see also Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1127–28 (10th Cir. 2011) ("If the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it.  By contrast, if the theory simply wasn't raised before the district court, we usually hold it forfeited." (citations omitted)).

The rigorous plain-error standard governs our review of such forfeited claims. That is, we "review for plain error where a defendant appeals the sufficiency of the evidence based upon an argument that he failed to make *or reaffirm* before the district court." *United States v. Gallant*, 537 F.3d 1202, 1223 (10th Cir. 2008) (emphasis added); *see also Kimler*, 335 F.3d at 1141 ("[B]ecause Kimler is deemed to have waived this issue, we will not address it on appeal 'except for a review for plain error resulting in manifest injustice.'" (quoting *United States v. Chavez-Marquez*, 66 F.3d 259, 261 (10th Cir. 1995))). Under the plain error standard, Mr. Cooper must demonstrate: "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights. If he satisfies these criteria, this Court may exercise discretion to correct the error if [4] it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Goode*, 483 F.3d at 681 (quoting *Kimler*, 335 F.3d at 1141) (internal quotation marks omitted).

As previously discussed, Mr. Cooper renewed his motion for judgment of acquittal post-verdict, asserting that "[w]ith respect to each count of conviction in this case, the government failed to prove the defendant's guilt beyond a reasonable doubt." R., Vol. 1, at 403. This post-verdict general motion for judgment of acquittal was filed without a brief. In Mr. Cooper's reply brief in support of his post-verdict motion, however, he specifically limited the motion to challenging the sufficiency of the evidence *only* as to the count for conspiracy to

defraud (Count 1), arguing that the government "failed to prove a criminal conspiracy as alleged in Count One," and that "if the evidence was insufficient to convict [Mr.] Cooper on Count One, all of the other convictions must be vacated as well." R., Vol. 1, at 435, 446. That is, his reply brief made clear that his motion—which previously purported to serve as a general motion challenging all counts of conviction—was focused solely upon the count for conspiracy to defraud. *Id.* at 434–35. Although he asserted in his reply brief that the remaining counts "depend[ed] upon the validity of the guilty verdict on Count One," *id.*, and therefore would fail if Count 1 failed, Mr. Cooper did not raise or reaffirm any independent challenge to the sufficiency of the evidence on the remaining counts.

Under these circumstances, Mr. Cooper has arguably forfeited his challenge to the sufficiency of the evidence on his remaining counts of conviction—that is, forfeited any independent challenge to the sufficiency of the evidence regarding his mail and wire fraud counts. Despite the fact that he had previously filed a general motion for judgment of acquittal, Mr. Cooper's restrictive representations in his reply brief could be construed, at least arguably, as transforming his general motion into a specific one, focused only on Count 1. If we were to conclude that Mr. Cooper has forfeited any challenge to the sufficiency of the evidence on his mail and wire fraud convictions, "we w[ould] not address [those convictions] on appeal 'except for a review for plain error resulting in manifest injustice.'" *Kimler*, 335 F.3d at 1141 (quoting *Chavez-Marquez*, 66 F.3d at 261)).

23

However, we need not definitively opine on whether Mr. Cooper's challenges to his mail and wire fraud convictions should be assessed under the stringent plain-error standard, because even under the more-lenient de novo standard, we conclude that there was no error. That is, we conclude that there was sufficient evidence to satisfy the only challenged element of the mail and wire fraud charges—i.e., a scheme to defraud.

## 2. Sufficiency of the Evidence

Viewed in the light most favorable to the government, the evidence presented at trial is sufficient to support Mr. Cooper's mail and wire fraud convictions. First, the testimonial evidence supporting the existence of a conspiracy to defraud under Count 1, discussed *supra*, supports the existence of a scheme or artifice to defraud Renaissance customers and the IRS. Furthermore, the government points to additional evidence that Mr. Cooper transmitted false, fraudulent, or misleading information by mail and wire "to recruit IMAs or encourage IMAs to continue their participation in Renaissance, which meant the defendant ultimately continued to receive their $100 monthly payments [from IMAs]." Aplee. Br. at 17; *see id.* at 16–17 (citing documentary evidence presented at trial—such as "a 1998 version of the TRS containing all of the misleading information on the audio-cassette tapes about the application of the [fraudulent] deductions for the home-based business" and other "promotional materials" used to further the fraudulent scheme—which were sent through the

24

"mail or interstate wire communication facilities"); *id.* at 14 (providing an overview of the "Renaissance Info Pak"—a promotional tool distributed through the mail—which contained several "false, fraudulent, or misleading" statements aimed at bringing in new IMAs). Viewed in the light most favorable to the government, this evidence (among other evidence presented at trial) was sufficient to support a finding of a scheme or artifice to defraud. Accordingly, even assuming, *arguendo*, that the issue is not forfeited, we nevertheless conclude that the government presented sufficient evidence supporting Mr. Cooper's convictions of mail and wire fraud.

## D. Sufficiency of the Evidence of Other Convictions

On appeal, Mr. Cooper roots his challenge to the sufficiency of the evidence of his convictions of conspiracy to launder money, engaging in monetary transactions in property derived from unlawful activity, and money laundering (Counts 105 through 148) solely in the claimed insufficiency of the evidence of his convictions of conspiracy to defraud and mail and wire fraud. Mr. Cooper argues that because the evidence supporting the conspiracy to defraud and mail and wire fraud convictions is insufficient, "[t]he money laundering conspiracy and substantive money laundering charges, which are expressly dependent on [those] counts, must then be reversed as well." Aplt. Opening Br. at 38 (citations omitted). Because Mr. Cooper's challenges to the sufficiency of the evidence of his conspiracy to defraud and mail and wire fraud convictions fail, his

25

challenges to the sufficiency of the evidence of his other convictions likewise fail.

## II.     Motion for New Trial: Materiality of Suppressed Impeachment Evidence

Mr. Cooper next challenges the district court's denial of his motion for a new trial, arguing that the district court erred in determining that the suppressed impeachment evidence and Mr. Gleason's substantive testimony were cumulative. This court reviews de novo claims that the prosecution violated *Brady* by failing to disclose material exculpatory evidence, "including the determination of whether suppressed evidence was material." *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir. 1994).

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Smith*, 534 F.3d 1211, 1221 (10th Cir. 2008) (quoting *Brady*, 373 U.S. at 87) (internal quotation marks omitted). "Impeachment evidence is exculpatory for *Brady* purposes." *Id.* at 1222 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)).

A defendant seeking a new trial based on a *Brady* violation "must show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material." *United States v. Torres*, 569 F.3d

26

1277, 1281 (10th Cir. 2009) (quoting *United States v. Velarde*, 485 F.3d 553, 558 (10th Cir. 2007)) (internal quotation marks omitted). As discussed above, the government conceded that the first two elements are met in this case; that is, that it suppressed favorable impeachment evidence that Mr. Gleason was engaged in fraudulent activity throughout the trial, including providing the IRS with false information about his income, concealing bank accounts, falsely encumbering assets, titling his businesses in the names of relatives, funneling income through accounts held in relatives' names, filing fraudulent and frivolous IRS forms, and making false claims via the Internet. Therefore, the only issue presented is whether the impeachment evidence at issue was material.

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 1282 (alteration in original) (quoting *Bagley*, 473 U.S. at 682 (Blackmun, J., concurring)) (internal quotation marks omitted). "The critical question is whether the lack of impeachment evidence shakes our confidence in the guilty verdict." *Smith*, 534 F.3d at 1223. "To make the materiality determination, we view the suppressed evidence's significance in relation to the record as a whole." *Hughes*, 33 F.3d at 1252. "What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Torres*, 569 F.3d at 1282 (quoting

27

*United States v. Robinson*, 39 F.3d 1115, 1119 (10th Cir. 1994)) (internal quotation marks omitted).

## A. Cumulative Impeachment Evidence

Mr. Cooper acknowledges that his cross-examination of Mr. Gleason at trial "establish[ed] that he testified falsely on direct about falsifications of his resume and about the substance of much of the tax advice that he provided to Renaissance." Aplt. Opening Br. at 41. However, despite the fact that he successfully impeached Mr. Gleason on the stand, Mr. Cooper argues that the impeachment evidence drawn out at trial concerned "the distant past," while the suppressed evidence "would have allowed the defense to show that at that very moment—while testifying as a government witness—[Mr.] Gleason was executing an extensive scheme to defraud the government." *Id.* Thus, according to Mr. Cooper, the suppressed evidence is not cumulative because it "would have opened an entirely new line of cross-examination." *Id.* at 42.

Where evidence "insignificantly impact[s] the degree of impeachment," it generally will "not be sufficient to meet the . . . materiality standard." *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009). For example, where the credibility of a witness "has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim." *Nuckols v. Gibson*, 233 F.3d 1261, 1267 n.8 (10th Cir. 2000) (quoting *Tankleff v. Senkowski*,

28

135 F.3d 235, 251 (2d Cir. 1998)) (internal quotation marks omitted). Furthermore, we have indicated that "an incremental amount of impeachment evidence on an already compromised witness does not amount to material evidence." *United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir. 1998) (citing *United States v. Derr*, 990 F.2d 1330, 1336 (D.C. Cir. 1993)).  Accordingly, we have "discarded as immaterial . . . undisclosed impeachment evidence where it was cumulative of evidence of bias or partiality already presented 'and thus would have provided only marginal additional support for [the] defense.'" *Douglas*, 560 F.3d at 1174 (alteration in original) (quoting *Trujillo*, 136 F.3d at 1394).

In contrast, suppressed evidence that "significantly enhanc[es] the quality of the impeachment evidence usually will" satisfy the materiality standard. *Douglas*, 560 F.3d at 1174.  For example, "[e]vidence that provides a new basis for impeachment is not [considered] cumulative and could well be material." *United States v. Robinson*, 583 F.3d 1265, 1273 (10th Cir. 2009) (quoting *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007)) (internal quotation marks omitted).  "Merely because other impeachment evidence was presented does not [necessarily] mean that additional impeachment evidence is cumulative . . . ." *Torres*, 569 F.3d at 1284.

Contrary to Mr. Cooper's assertions, the evidence suppressed here does not provide an entirely new basis for impeachment.  The suppressed evidence—which

29

Mr. Cooper characterizes as showing that Mr. Gleason "was executing an extensive scheme to defraud the government," Aplt. Opening Br. at 41—would provide an impeachment avenue by which to establish that Mr. Gleason is a liar and a tax cheat. But, as noted, Mr. Cooper concedes that he already "was able to establish that [Mr. Gleason] testified falsely on direct about falsifications of his resume and about the substance of much of the [fraudulent] tax advice that he provided to Renaissance." *Id.* The evidence available to Mr. Cooper at trial and the suppressed evidence both impeach Mr. Gleason's credibility by suggesting that he is a dishonest person. Therefore, the suppressed evidence regarding Mr. Gleason would have "insignificantly impact[ed] the degree of impeachment," and "would have provided only marginal additional support for [the] defense." *Douglas*, 560 F.3d at 1174 (second alteration in original) (quoting *Trujillo*, 136 F.3d at 1394) (internal quotation marks omitted). This does not satisfy the materiality standard.

The cases in which this court has found that a new basis for impeachment existed generally involved a much starker contrast between the available and suppressed impeachment evidence. In *Robinson*, the defendant was able to cross-examine a confidential informant "on his criminal history, the payments he received from the [Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF")], and the ATF's intervention on his behalf following 'scrape[s]' with the law," 583 F.3d at 1269 (second alteration in original), but the suppression of the

30

confidential informant's medical records left the defendant unable "to argue that the [confidential informant's] drug use, mental health problems, and use of prescription drugs at the time of trial affected his testimony," *id.* at 1273. In *Nuckols*, the suppressed evidence "would have provided the defense with the opportunity to call into question whether [the witness] had a motive for his testimony" and "could also have been used to question whether [the witness] had a motive to goad Mr. Nuckols into waiving his right to counsel during the interrogation and confessing to the crime." 233 F.3d at 1267. Similarly, the *Douglas* court held that there was "a reasonable probability the result of [the defendant's] trial would have been different if the defense had had the ability to impeach [the witness] with evidence of the deal the prosecution made in exchange for his testimony," where "[the defendant's] counsel attempted to impeach [the witness] on the issue of his motive to testify, [but] was stonewalled by [the witness's] repeated denials of the existence of a deal." 560 F.3d at 1175.[8]

---

[8] Although this court's decision in *United States v. Torres* presents a closer call, it is distinguishable. There we held that suppressed evidence of a confidential informant's misidentification of the defendant was not cumulative of an earlier misidentification. 569 F.3d at 1283–84. We reached our conclusion because, with the evidence, "defense counsel could have shown that, rather than the first misidentification being a one-time slip-of-the-tongue, the [confidential informant] had difficulty identifying the various members of Mr. Torres's extended family and might reasonably have thought she was dealing with one member when in fact it was another." *Id.* at 1284. However, in *Torres*, evidence that the confidential informant had been retained by the DEA on two other occasions was also wrongly suppressed and deemed material. *See id.* at 1280, 1282–83. Moreover, the confidential informant was the government's critical

(continued...)

31

In contrast, the relationship between the available and suppressed impeachment evidence here is similar to that in cases in which this court has concluded that the suppressed evidence was merely cumulative. In *Trujillo*, the government witness "testified on direct examination [that] he had three prior felony convictions and was testifying against Mr. Trujillo as a result of a plea agreement . . . [and] further admitted to using cocaine and being a car thief." 136 F.3d at 1394. We rejected Mr. Trujillo's argument that the suppressed evidence was "of a different type and magnitude than that presented at trial because it contained statements inconsistent with [the witness's] trial testimony and went beyond the potential motive and bias implicit in [the witness's] plea agreement." *Id*. Although "we acknowledge[d] [that] there may be a difference in the degree to which [the witness] could have been impeached [by the suppressed evidence] . . . , we fail[ed] to see any meaningful difference in the type of impeachment evidence [that was] available to the defense." *Id.* "The jury," we concluded, "was well

_____

[8](...continued)
witness: "the government's case hinge[d] on the [confidential informant's] credibility." *Id.* at 1283. As we see it, the factual context of *Torres* distinguishes it from this case. Here, unlike in *Torres*, repetition of the conduct at issue was not especially important; the jury had already been presented with evidence suggesting that Mr. Gleason was dishonest and a liar, especially with regard to financial and tax matters. Another series of lies of at least roughly the same ilk would have been unlikely to have materially affected their judgment on this point. Further, there was other suppressed evidence at play in *Torres* of an entirely different sort (i.e., the DEA evidence) that arguably could have factored into or influenced the court's overall conclusion that all of the suppressed evidence at issue was material. There is no such additional evidence here. In sum, we conclude that *Torres* is distinguishable.

32

aware of [the witness's] criminal propensities and motive for testifying . . . ." *Id.*; *see United States v. Page*, 808 F.2d 723, 726, 730, 732–33 (10th Cir. 1987) (concluding that suppressed evidence that the witness had been arrested was cumulative where he had seven felony convictions, and that testimony concerning whether certain payments were bribes was cumulative where checks were introduced into evidence and other witnesses testified on this issue).  In this case, due to the impeachment evidence displayed at trial on cross-examination, the jury was well aware that Mr. Gleason was a dishonest person, and equally aware that he had been involved in fraudulent tax activity.  Furthermore, as discussed *infra*, because Mr. Gleason's testimony was itself cumulative, he was not a critical witness for the prosecution.

In the end, because the impeachment evidence was merely cumulative, we are not convinced that the government's suppression undermines confidence in the outcome of Mr. Cooper's trial.  *See Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) ("We need to be convinced only that 'the government's evidentiary suppression undermines confidence in the outcome of the trial.'" (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))).  Accordingly, we conclude that the impeachment evidence suppressed here was not material.

### B.     Cumulative Witness Testimony

Mr. Cooper also contends that the district court erred when it concluded that Mr. Gleason's testimony was itself cumulative.  Mr. Cooper argues that Mr.

33

Gleason "was a unique witness due to his position with Renaissance and the scope of services that he provided." Aplt. Opening Br. at 42. Mr. Cooper further argues that in contrast to his other co-defendants, whose "testimony as a whole was favorable to him and to the company, its objectives, and its product," Mr. Gleason "provided testimony that was generally and pervasively hostile." *Id.* at 43. The government responds that Mr. Gleason's testimony was not essential to Mr. Cooper's convictions because Mr. Gleason "was one of several tax return preparers who acknowledged preparing false or fraudulent tax returns in furtherance of the Renaissance scheme" and "was only one of several coconspirators who had specifically drawn the defendant's attention to faults with the Renaissance scheme, and the defendant chose to ignore the advice and information from each." Aplee. Br. at 27–28.

In instances where we have concluded that the allegedly suppressed impeachment evidence was material, we have stressed that the witness being impeached was absolutely critical to the government's case. *See Robinson*, 583 F.3d at 1271 ("[H]is testimony was central—indeed essential—to the government's case. . . . It is not a stretch to say that the guilty verdict in this case depended upon the [confidential informant's] testimony."); *Douglas*, 560 F.3d at 1175 ("[The witness] was an indispensable witness for the State's case against [the defendant]. . . . Because impeachment of the witness who held the key to the successful prosecution of [the defendant] was denied to the defense, the district

34

court correctly concluded that the State's *Brady* violations were material.");

*Nuckols*, 233 F.3d at 1266 ("[The witness's] trial testimony was key to a successful prosecution. . . . If [the witness's] testimony that Mr. Nuckols initiated the interrogation were impeached, the entire support for the State's case would have been significantly undermined, if not destroyed altogether.").

A review of the evidence here demonstrates that Mr. Gleason—although an *important* witness—was not a *crucial* or *critical* witness to the government's case because several other co-conspirators provided commensurate testimony. As the district court stated: "[Mr.] Gleason was not the sole tax return preparer to testify that false or fraudulent tax returns were filed with the IRS as a result of Renaissance's activities." R., Vol. 4, at 781. For example, "[Mr.] Steelman . . . , [Ms.] Ruth[,] and [Ms.] Crotts testified that the fraudulent tax returns they prepared for Renaissance [IMAs] . . . were consistent with the false tax advice provided by [Mr. Cooper] and Renaissance," *id.*, and "multiple co-conspirators testified at trial that they raised concerns about the false tax advice to [Mr. Cooper]," *id.* at 782. This point is underscored by our precedent; as a witness, Mr. Gleason was not as unique and critical as the government's witnesses in *Robinson*, *Douglas*, *Nuckols*, and *Torres*. In light of the foregoing, we conclude the district court was correct in concluding that "[Mr.] Gleason's testimony was merely cumulative evidence of [Mr. Cooper's] illegal activities." *Id.* at 783. Consequently, the suppressed impeachment evidence regarding Mr. Gleason was

35

not material.

### III. Motion to Suppress: Validity of Warrants

Mr. Cooper argues that the district court erred in denying his motion to suppress because the warrants were issued without probable cause. Additionally, he argues that the district court erred in denying his motion to suppress because the warrants were insufficiently particular.[9] Lastly, Mr. Cooper argues that the district court should have held an evidentiary hearing under *Franks v. Delaware*.

When reviewing the denial of a motion to suppress based on alleged Fourth Amendment violations, this court

> consider[s] the totality of the circumstances and view[s] the evidence in a light most favorable to the government. We accept the district court's factual findings unless those findings are clearly erroneous. The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court. Keeping in mind that the burden is on the defendant to prove that the challenged search was illegal under the Fourth Amendment, the ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable de novo.

*United States v. Higgins*, 282 F.3d 1261, 1269 (10th Cir. 2002) (quoting *United*

---

[9] Mr. Cooper acknowledges that the warrants, and the affidavits underlying these warrants, "each recite the same 'facts' and assertions to support probable cause." R., Vol. 1, at 122; *see* Aplt. Opening Br. at 26–27 ("The search warrant affidavits . . . [and] seizure warrants utilize virtually identical language." (citing the twelve warrants executed on October 11, 2000)). Moreover, neither the parties nor the district court appear to draw any distinctions among the numerous warrants and supporting affidavits. Accordingly, for ease of reference, we cite to the (shared) language of only one of the search warrants—that is, the search warrant executed October 11, 2000, on Renaissance's distribution center, as well as the supporting application and affidavit.

*States v. Gordon*, 168 F.3d 1222, 1225 (10th Cir. 1999)) (internal quotation marks omitted). We conclude that the search warrants complied with the dictates of the Fourth Amendment, and we therefore hold that the district court did not err in denying Mr. Cooper's motion to suppress. We also hold that Mr. Cooper was not entitled to an evidentiary hearing under *Franks*.[10]

## A.    Probable Cause

In support of his motion to suppress, Mr. Cooper first asserts that the "warrants . . . were lacking in probable cause," and therefore did not comply with the Fourth Amendment. Aplt. Opening Br. at 36. In determining whether a search warrant is supported by probable cause, this court "reviews the sufficiency of the affidavit upon which a warrant is issued by looking at the totality of the circumstances and simply ensuring 'that the magistrate had a substantial basis for concluding that probable cause existed.'" *United States v. Tisdale*, 248 F.3d 964, 970 (10th Cir. 2001) (quoting *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)). "Probable cause means that 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Gates*, 462 U.S. at

---

[10]    Mr. Cooper asserts that, were we to hold that the warrants violated the Fourth Amendment such that any evidence seized pursuant to their execution should have been suppressed, "all fruits of the poisonous tree" must also be suppressed. Aplt. Opening Br. at 48–49. The government, on the other hand, argues that any Fourth Amendment violation does not require suppression of any evidence because the good-faith exception to the warrant requirement—articulated by the Supreme Court in *United States v. Leon*—is applicable in this case. Because we conclude that the warrants complied with the Fourth Amendment, we need not address either of these arguments.

238). "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239.

The district court found that "the magistrate had a substantial basis for concluding that there was a fair probability that contraband or evidence of a crime would be found in the places to be searched or that the searches would uncover evidence of wrongdoing." R., Vol. 2, at 53–54. The court explained that "[t]he affidavits state facts, not just conclusions, and provided the magistrates with the opportunity to make an independent evaluation of the allegedly false and misleading claims." *Id.* at 54.

On appeal, Mr. Cooper correctly asserts that "whether the information set forth in an affidavit is sufficient to support probable cause must be determined on the basis of the facts presented to the magistrate, and not on mere conclusions." Aplt. Opening Br. at 45. He argues that the affidavits presented to the magistrate judge in this case "did not provide a substantial basis for determining that probable cause existed, and [that] the magistrate's determination was merely the ratification of the agents' bare conclusions." *Id.* at 46. Accordingly, he posits, "probable cause was lacking," *id.*, and therefore the warrants did not comply with the Fourth Amendment.

Mr. Cooper cites only two examples of what he believes to be such "bare conclusions": (1) "[a]ccording to Renaissance's promotional material, all new

38

members are automatically entitled to $5,000.00 in income tax deductions for the current calendar year"; and (2) "[e]ssentially, Renaissance is selling and offering to sell an income tax reduction package that promises immediate income tax deductions and reductions to individuals who have not incurred expenses in a legitimate home-based business." *Id.* at 45–46 (alterations in original) (internal quotation marks omitted). However, these are not the type of bare conclusions with which the Supreme Court has shown concern.

The *Gates* court gave two examples of conclusory statements that failed to provide magistrates with a substantial basis for concluding that probable cause exists. In that case, the Court stated that neither "[a] sworn statement of an affiant that 'he has cause to suspect and does believe that' [contraband] is located on certain premises," *Gates*, 462 U.S. at 239 (quoting *Nathanson v. United States*, 290 U.S. 41 (1933)), nor "[a]n officer's statement that 'affiants have received reliable information from a credible person and believe' that [drugs are] stored in a home," *id.* (quoting *Aguilar v. Texas*, 378 U.S. 108 (1964)), was sufficient. Those were examples of "wholly conclusory statement[s]" that utterly lacked any factual support. *Id.*

Here, on the other hand, the twenty-seven-page affidavit sets forth numerous facts upon which a magistrate judge could find probable cause. For example, the affidavit asserts that on "nine separate occasions," an undercover agent was mailed "Renaissance promotional material such as videotapes, brochures, tax forms, and

39

other material containing some false and misleading information." Supp. R., Vol. 2, at 147 (Appl. & Affidavit for Search Warrant, Gov. Exh. 1, filed Oct. 6, 2000). The affidavit goes on to detail the dates and contents of these mailings, as well as the nature of various false statements, misrepresentations, or omissions contained therein. The affidavit also details the actions of three undercover agents who met with Renaissance affiliates—including Mr. Cooper—and unearthed evidence regarding the fraudulent nature of the Renaissance scheme. Included in the agents' account are statements by Renaissance affiliates, which the agents surreptitiously recorded.

These examples are a far cry from the sort of bare conclusions that the Supreme Court disapproved of in *Gates*. To the contrary, the assertions made in the affidavit—which are supported by sufficient facts—provided the magistrate judge in this case "with a substantial basis for determining the existence of probable cause." *Gates*, 461 U.S. at 239. Accordingly, we hold that the district court committed no error in determining that the magistrate judge had a substantial basis for concluding that probable cause existed.

## B. Particularity

Mr. Cooper next claims that the search warrants were invalid under the Particularity Clause of the Fourth Amendment. He argues that the warrants were "constitutionally overbroad" because they "authorized precisely the general searches of Renaissance property that are proscribed by the Fourth Amendment"

40

and "fail[ed] to state what criminal activity was being investigated, instead merely reciting the mail fraud and money laundering statutes." Aplt. Opening Br. at 36, 47. This court reviews de novo "whether the warrant at issue is sufficiently particular." *United States v. Williamson*, 1 F.3d 1134, 1135 (10th Cir. 1993).

The Fourth Amendment's Particularity Clause provides that warrants must "particularly describ[e] the place to be searched, and the persons or things to be seized." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (emphasis omitted) (quoting U.S. Const. amend. IV) (internal quotation marks omitted). "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005) (quoting *United States v. Leary*, 846 F.2d 592, 600 (10th Cir. 1988)) (internal quotation marks omitted). "Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." *Id.* Furthermore, although the Fourth Amendment "requires particularity in the warrant, not in the supporting documents," *Groh*, 540 U.S. at 557, "the Fourth Amendment [does not] prohibit[] a warrant from cross-referencing other documents," *id.*, such as an affidavit, which may allow the warrant in some circumstances to satisfy the particularity requirement. *See, e.g.*, *Riccardi*, 405 F.3d at 863 n.1 ("Where the warrant itself is insufficiently specific regarding the items to be searched and seized, this Court has held that the affidavit in support of

41

the warrant can cure the want of specificity . . . .").  In this instance, the warrants—when read in light of the crime being investigated (i.e., a broad and complex financial scheme to defraud), and when considered in conjunction with the supporting affidavits—were sufficiently particular to satisfy the requirements of the Fourth Amendment.[11]

It is true that the warrants viewed in isolation speak in general terms.  *See* Supp. R., Vol. 2, at 184 (Search Warrant, dated Oct. 6, 2000) (only describing the building to be searched, listing the statutes alleged to be violated, and referring to a two-page "attached list of items" to be seized).  Mr. Cooper argues they were constitutionally deficient because they "fail to state what criminal activity was being investigated, instead merely reciting the mail fraud and money laundering statutes," and were therefore "essentially unlimited, containing an exhaustive list of virtually everything needed to run a business."  Aplt. Opening Br. at 47.

---

[11]     In concluding that the warrants were sufficiently particular, the district court consulted the supporting affidavits.  *See* R., Vol. 2, at 55 (referring to "the facts set forth in the affidavit").  Generally, an "affidavit in support of the warrant can cure the want of specificity . . . only if the affidavit is both incorporated in and attached to the warrant."  *Riccardi*, 405 F.3d at 863 n.1.  It is unclear whether those two requirements are met in this case.  However, before the district court, Mr. Cooper did not object to the court's practice of referring to the affidavits, nor has he challenged that practice on appeal.  In fact, at oral argument, Mr. Cooper's attorney acknowledged that the court in this case was "absolutely" permitted to consider the affidavits in determining whether the warrants satisfied the Fourth Amendment's particularity requirements.  Oral Argument at 9:15–9:44.  Therefore, the propriety of incorporating the affidavits in evaluating Mr. Cooper's particularity claim is not before us on appeal.  Like the district court, we therefore consider the warrants in conjunction with the affidavits.

However, despite the generality of the warrants themselves, the supporting affidavits fill in many of the necessary details. In particular, the affidavits flesh out how the conduct being investigated is related to the statutes listed on the warrants. For example, the affidavits indicate that "[t]he use of the United States mail and commercial interstate carriers to transport Renaissance promotional materials or other matters in furtherance of this scheme or artifice to defraud United States consumers is in violation of 18 U.S.C. § 1341, which is mail fraud." Supp. R., Vol. 2, at 144. The affidavits additionally state that "[t]he use of these fraud proceeds to promote the fraud or to conceal the identity, source, or nature of the proceeds would be money laundering in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957." *Id.* Furthermore, they describe various "mailings [that] contained Renaissance promotional material such as videotapes, brochures, tax forms, and other material containing some false and misleading information," *id.* at 147, and various bank and brokerage accounts held by Mr. Cooper, Renaissance, or associated entities, *see id.* at 153–58. Importantly, the affidavits also include a list of "[i]tems to be seized," *id.* at 161–62, 86–87, which—when read in conjunction with the warrant and the remainder of each affidavit—would "enable[] the [executing officers] to reasonably ascertain and identify the things authorized to be seized," *Riccardi*, 405 F.3d at 862 (quoting *Leary*, 846 F.2d at 600). Contrary to Mr. Cooper's assertions, the warrants and affidavits do much more than "merely recit[e] the mail fraud and money laundering statutes." Aplt. Opening Br. at 47.

Furthermore, as noted above, "[e]ven a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as specific as the circumstances and the nature of the activity under investigation permit." *Riccardi*, 405 F.3d at 862 (quoting *Leary*, 846 F.2d at 600). In other words, whether a search warrant is sufficiently particular depends in part on the nature of the crimes being investigated. Warrants relating to more complex and far-reaching criminal schemes may be deemed legally sufficient even though they are less particular than warrants pertaining to more straightforward criminal matters. *See United States v. Hargus*, 128 F.3d 1358, 1362 (10th Cir. 1997) ("[W]e are satisfied that [the warrant] is sufficiently limited and specific, in view of the nature of this extended conspiracy and other crimes for which he was being investigated . . . ."); *United States v. Janus Indus.*, 48 F.3d 1548, 1554 (10th Cir. 1995) ("The type of criminal activity under investigation in the present case—a drug paraphernalia business—makes it difficult to list with great particularity the precise items desired to be seized which evidence such activity."). Indeed, the complex and comprehensive nature of the broad scheme of financial criminal activity implicated in this case "makes it difficult to list with great particularity the precise items desired to be seized which evidence such activity." *Janus Indus.*, 48 F.3d at 1554. In the face of this difficulty, the affiants provided a meaningful and sufficient amount of detail.

In sum, the affidavits provide significantly more detail than the search

warrants regarding the crimes at issue and the nature of the items to be seized.

Reading the affidavits in conjunction with the search warrants "enable[d] the searcher to reasonably ascertain and identify the things authorized to be seized." *Riccardi*, 405 F.3d at 862 (quoting *Leary*, 846 at 600). In light of the complex nature of the activities being investigated here, we conclude that the warrants were sufficiently particular when read in conjunction with their supporting affidavits.

### B. *Franks* Hearing

Mr. Cooper alternatively argues that the district court erred in failing to afford him an evidentiary hearing pursuant to *Franks v. Delaware*. His argument in support of this claim, in its entirety, states: "Alternatively, the [district] court at least should have held a hearing pursuant to [*Franks*], as the information before the court constituted a substantial preliminary showing that the agents knowingly, or with reckless disregard for the truth, made false statements in the affidavits." Aplt. Opening Br. at 49 (citing *Franks*, 438 U.S. at 171–72; *United States v. Basham*, 268 F.3d 1199, 1204 (10th Cir. 2001)). As Mr. Cooper provides no other argument or authority in support of this claim, he has insufficiently raised it on appeal. It is well-settled that "[a]rguments inadequately briefed in the opening brief are waived." *Adler v. Wal-mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998); *see, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). We therefore conclude

45

that Mr. Cooper has waived this argument on appeal.[12]

In any event, even if we were to conclude that Mr. Cooper had adequately presented his *Franks* argument on appeal, we would hold that his claim is without merit. We briefly address it here.

A defendant is entitled to a *Franks* hearing if he "makes a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997) (citing *Franks*, 438 U.S. at 155–56). "[T]he standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods." *Id.* (quoting *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir. 1990)) (internal quotation marks omitted). A defendant's allegations must be accompanied by an offer of proof. *United States v. Owens*, 882 F.2d 1493, 1498 (10th Cir. 1989). Defendants must "point out specifically the portion of the

---

[12] At oral argument, both Mr. Cooper's counsel and the government indicated that they believed that the *Franks* issue is before the court on appeal. *See* Oral Argument at 11:38 (Judge: "Did you raise a *Franks* challenge, at all?" Counsel for Mr. Cooper: "I did." Judge: "Is that before us on appeal?" Counsel for Mr. Cooper: "It is."); *id.* at 12:07–14:40 (acknowledging that the *Franks* issue was "raised in the appellant's [opening] brief" and was before the court on appeal). However, we are not bound by the parties' concessions made at oral argument as to whether this issue has been adequately placed before the court on appeal. *See, e.g.*, *Koch v. U.S. Dept. of Interior*, 47 F.3d 1015, 1018 (10th Cir. 1995) ("[A] court is not bound by stipulations of the parties as to questions of law." (quoting *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 n.1 (9th Cir. 1986)) (internal quotation marks omitted)).

warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Id.* (quoting *Franks*, 438 U.S. at 171).

"[T]his court has not adopted a standard of review [for the denial of a *Franks* hearing] but other Circuit Courts of Appeals apply either a clear error standard or a de novo standard." *United States v. Gentry*, 406 F. App'x 274, 279 (10th Cir. 2010); *accord United States v. Vandemerwe*, 405 F. App'x 344, 347 (10th Cir. 2010) ("[W]e have not expressly indicated what standard of review applies to a district court's refusal to conduct a *Franks* hearing." (alteration in original) (quoting *United States v. Archuleta*, 222 F. App'x 710, 715 (10th Cir. 2007)) (internal quotation marks omitted)). We need not opine on the appropriate standard of review that this court should adopt, because we may uphold the district court's decision to not afford Mr. Cooper a *Franks* hearing even applying the more-searching de novo standard.

The district court found that Mr. Cooper "ha[d] not made a substantial preliminary showing that the agents knowingly or recklessly withheld information from the magistrates or that the allegedly false statements were necessary to the finding of probable cause," and that he therefore was not entitled to a *Franks* evidentiary hearing. R., Vol. 2, at 56. Mr. Cooper makes a conclusory argument that the district court should have held a *Franks* hearing because "the information

47

before the court constituted a substantial preliminary showing that the agents knowingly, or with reckless disregard for the truth, made false statements in the affidavits." Aplt. Opening Br. at 49. Separately, in discussing the *Leon* good-faith exception, Mr. Cooper submits that "the agents deliberately withheld any factual information that would have allowed a magistrate to make an independent determination as to whether Renaissance was in fact making the representations in its promotional materials that the agents claimed it was making," and that "[t]he agents, at a minimum, 'were reckless in not including in the affidavit information which was known and easily accessible to them.'" *Id.* at 48 (quoting *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987)).

Mr. Cooper has utterly failed to satisfy his burden here. On appeal, Mr. Cooper does not so much as identify any intentionally or recklessly false statements or material omissions by the affiants. Nor does he assert that, with such misstatements or omissions rectified, the affidavit would not support a finding of probable cause. Accordingly, even if this issue were not waived, we would conclude that the district court did not err in denying Mr. Cooper's request for a *Franks* hearing.

## CONCLUSION

Based on the foregoing, we affirm the district court's denials of Mr. Cooper's motions for judgment of acquittal, motion for a new trial, and motion to suppress, and therefore affirm Mr. Cooper's convictions.

48